UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN KNOWLES, | |
| Petitioner, | |
| v. | No. 18-CV-1950 (KMK) |
| UNITED STATES OF AMERICA, | |
| Respondent. | |
| UNITED STATES OF AMERICA | |
| v. | No. 11-CR-630 (KMK) |
| STEVEN KNOWLES, | OPINION & ORDER |
| Defendant. | |

Appearances:

Ruth M. Liebesman, Esq.
Ruth M. Liebesman, Attorney-at-Law
New York, NY
*Counsel for Petitioner*

Samuel Raymond, Esq.
United States Attorney's Office
New York, NY
*Counsel for Respondent*

KENNETH M. KARAS, District Judge:

Petitioner Steven Knowles ("Knowles" or "Petitioner") has filed a Petition, pursuant to

28 U.S.C. § 2255, to vacate, set aside, or correct his sentence (the "Petition"), (Dkt. No. 1, Case

No. 18-CV-1950), and has moved pursuant to Federal Rule of Criminal Procedure 33 for a new

trial (the "Motion"), (Dkt. No. 1300, Case No. 11-CR-630). [1]   For the reasons stated herein, the Petition and Motion are denied.

## I.  Background

### A.  Factual Background

#### 1.  The Indictment

On April 22, 2013, a grand jury returned Superseding Indictment S8 11-CR-630 (KMK) (the "Indictment") charging Petitioner, along with four co-defendants, with 11 counts of crimes related to conspiracy, racketeering, narcotics trafficking, and the murder of Christopher Cokley ("Cokley").  (*See generally* Indict. (Dkt. No. 670, Case No. 11-CR-630).)  Count One charged Petitioner with participating in a racketeering enterprise in violation of 18 U.S.C. §§ 1961 and 1962(c).  (*Id.* ¶¶ 1–24).  Count Two charged Petitioner with racketeering conspiracy in violation of 18 U.S.C. 1962(d).  (*Id.* ¶¶ 25–28).  Counts Three and Four charged Petitioner with conspiracy to murder in aid of racketeering and murder in aid of racketeering activity, respectively, in connection with the July 2009 murder of Cokley, in violation of 18 U.S.C. §§ 1959(a)(1) and (a)(5).  (*Id.* ¶¶ 29–33).  Count Seven charged Petitioner with conspiracy to distribute 280 grams or more of crack cocaine in violation of 21 U.S.C. § 846.  (*Id.* ¶¶ 38–41).  Counts Eight, Nine, and Ten charged Petitioner with the use of a firearm related to conspiracy, racketeering, narcotics trafficking, and the murder of Cokley, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(c)(1)(C)(i), and 924(j).  (*Id.* ¶¶ 42–44). [2]

---

[1] Some of the Parties' papers were filed on the criminal docket (Case No. 11-CR-630), instead of the civil docket (Case No. 18-CV-1950).  The docket citations are reflected as such.

[2] Counts Five, Six, and Eleven charged Petitioner, respectively, with (i) conspiracy to murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(5), (ii) attempted murder in aid of racketeering activity under 18 U.S.C. §§ 1959(a)(3) and (a)(5), and (iii) the use and carry of a firearm in connection with the 2010 attempted murder of Jose Cruz in violation of 18 U.S.C. §§

These charges followed an investigation of a violent street gang known as the "Elm Street Wolves," a criminal organization that operated in and around Yonkers during the time alleged in the Indictment, whose members engaged in narcotics trafficking, assault with dangerous weapons, and murder. (*See* Indict. ¶ 1). The Elm Street Wolves and their associates sold crack cocaine at, among other places, the intersection of Elm and Oak Streets. (*Id.* ¶ 6.) The Indictment alleged that certain members and associates of the Elm Street Wolves maintained firearms for use by other members and associates of the gang. (*Id.* ¶ 10.) These firearms would be stored at readily accessible locations and used to protect the gang's territory and attack rival gang members. (*Id.*)

The Government alleged that Petitioner was one of the leaders of the Elm Street Wolves during the time alleged in the Indictment. (*Id.* ¶ 7.) Petitioner began selling crack cocaine on Elm Street with other members as early as 2000 and commissioned multiple shootings against rival gang members and other individuals who challenged the Elm Street Wolves. (*Id.*) One such rival gang was the "Strip Boyz," (*id.* ¶ 4), of which Cokley was a member, (*id.* ¶ 16). From about 2004 to about August 2011, "the Elm Steet Wolves engaged in a violent dispute with . . . the Strip Boyz . . . [d]uring [which] members of the Elm Street Wolves and Strip Boyz committed multiple shootings, beatings, stabbings, and assaults against one another." (Gov't's Opp'n to Pet'r's Pet. for Writ of Habeas Corpus and Mot. For New Trial ("Gov't's Opp'n") at 4 (Dkt. No. 1309, Case No. 11-CR-630).) One such incident was the July 2009 shooting of Cokley. (*Id.* at 3.)

---

924(c)(1)(A)(iii) and 924(c)(1)(C)(i). (*Id.* ¶ 34–37, 45). The jury found Petitioner not guilty of these offenses. (Judg. at 1–2 (Dkt. No. 1109, Case No. 11-CR-630).)

2.  Trial

Petitioner stood trial in this Court before a jury from June 3, 2013 to July 1, 2013.

(Pet'r's Mem. of Law in Supp. of Pet. For Writ of Habeas Corpus ("Pet'r's Habeas Mem.") at 3

(Dkt. No. 2, Case No. 18-CV-1950).)  During trial, the Government presented testimony from

numerous witnesses—including both civilian eyewitnesses and cooperating witnesses—as well

as crime scene photographs, ballistics evidence, and surveillance video.  (Gov't's Opp'n at 3–4).

a.  Witness Testimony

The Government relied on testimony from multiple cooperating gang members, including

Dexter Granger ("Granger"),[3] Michael Dennis ("Dennis"),[4] and Jason Harris ("Harris"),[5] who

each provided corroborating testimony regarding Petitioner's role in the planning and execution

---

[3]  Granger pled guilty to conspiracy to distribute and possession with intent to distribute crack and marijuana under 21 U.S.C. §§ 841(b)(1)(A) and 846; use of a firearm in furtherance of a drug trafficking offense under 18 U.S.C. §§ 942(c)(1)(A)(iii) and 942(c)(2); use of a firearm in furtherance of a crime of murder under 18 U.S.C. §§ 924(j)(1) and 924(j)(2); conspiracy to commit Hobbs Act robbery under 18 U.S.C. § 1951; and use of a firearm in furtherance of a crime of violence under 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(c)(1)(C)(i), and 924(c)(2).  (*See* Granger Judg. (Dkt. No. 1096, Case No. 11-CR-630).)  Granger was sentenced to time served and 5 years of supervised release.  (*Id.*)

[4]  Dennis pled guilty to conspiracy to distribute and possession with intent to distribute crack and marijuana under 21 U.S.C. §§ 841(b)(1)(A) and 846; use of a firearm in furtherance of a drug trafficking offense under 18 U.S.C. § 942(c)(1)(A)(iii); use of a firearm in furtherance of a crime of murder under 18 U.S.C. § 924(j); conspiracy to commit robbery under 18 U.S.C. § 1951; and carrying and discharging a firearm in furtherance of a crime of violence under 18 U.S.C. §§ 924(c)(1)(A)(iii) and 924(c)(1)(C)(i).  (*See* Dennis Judg. (Dkt. No. 1139, Case No. 11-CR-630).)  Dennis was sentenced to time served and 10 years of supervised release.  (*Id.*)

[5]  Harris pled guilty to conspiracy to distribute and possession with intent to distribute more than 280 grams of cocaine under 21 U.S.C. § 846; use of a firearm in furtherance of a drug trafficking offense under 18 U.S.C. § 942(c)(1)(A)(i); and obstructing justice by destroying, altering, and concealing evidence under 18 U.S.C. § 1512(c)(1).  (*See* Harris Judg. (Dkt. No. 1013, Case No. 11-CR-630).)  Dennis was sentenced to time served and 5 years of supervised release.  (*Id.*)

of Cokley's murder. (*See generally* Trial Transcript ("Tr.") (Dkt. Nos. 750, 752, 754, 757, Case No. 11-CR-630).)

Granger testified that on July 3, 2009, he, along with Petitioner, Dennis, Michael Andrews (Andrews"),[6] and Rakeem Wilson ("Wilson"),[7] had been drinking all day and discussing possible retaliation against the Strip Boyz. (Tr. at 238–42.) Granger testified that Dennis had a 9-millimeter handgun on him at the time. (*Id.* at 243.) He further testified that the night of the murder, he, Petitioner, Dennis, Andrews, and Wilson drove to Petitioner's house, where they obtained a Smith & Wesson .357 magnum revolver, which was introduced into evidence as Government Exhibit 401. (*Id.* at 242–43.) Granger testified that he believed the .357 revolver was the one used to murder Cokley because of its chrome color, the brownish color of the handle, and the red color at the front on the tip. (*Id.* at 246–47.) He also testified that while at Petitioner's home, they obtained hooded sweatshirts and a mask. (*Id.* at 244.) Granger testified that Petitioner cut eye holes into the back of one of the sweatshirts to use as a makeshift mask. (*See id.*)

According to Granger, Andrews drove the group to the Schlobohm Housing Project (the "Housing Project") in Yonkers, where Granger gave the .357 revolver and sweatshirt to Petitioner, who climbed a fence and crawled through a creek to enter the Housing Project with Dennis. (*Id.* at 250–54.) Granger testified to witnessing Petitioner exit the Housing Project following gun shots, take off his hooded sweatshirt, and give the gun to Wilson, who disposed of

---

[6] Andrews pled guilty to conspiracy to distribute and possession with intent to distribute cocaine under 21 U.S.C. § 846 and use of a firearm in furtherance of a drug trafficking offense under 18 U.S.C. § 942(c)(1)(A)(iii). (*See* Andrews Judg. (Dkt. No. 887, Case No, 11-CR-630).) Andrews was sentenced to 180 months followed by 5 years of supervised release.

[7] Wilson pled guilty to conspiracy to commit murder in aid of a racketeering enterprise under 18 U.S.C. § 1959(a)(1) and was sentenced to 120 months followed by 3 years of supervised release. (*See* Wilson Judg. (Dkt. No. 947, Case No. 11-CR-630).)

it in the trees. (*Id.* at 258–61.)  They then drove to the apartment of Shantel Williamson

("Williamson"), a known stash house for the Elm Street Wolves, where they met Dennis—who

ran there after the shooting.  (*Id.* at 262–65.)  On the way to Williamson's apartment, Granger

testified that Petitioner said he thought "he got one of them . . . he['d] seen Chris Cokley grab his

head."  (*Id.* at 261.)  Granger testified that nearly a year afterwards, Petitioner bragged to

Granger about how he "got away with murder."  (*Id.* at 267–68.)

Dennis corroborated Granger's testimony with regard to planning a retaliation against the

Strip Boyz on July 3, 2009.  (Gov't's Opp'n at 5–6; *see also* Tr. at 2049–52.)  He testified to

possessing a 9-millimeter handgun at the time, (Gov't's Opp'n at 5; *see also* Tr. at 2053);

obtaining masked hoodies; retrieving the .357 firearm at Petitioner's home, (Gov't's Opp'n at 5;

*see also* Tr. at 2056–59); driving to the outskirts of the Housing Project with Granger, Petitioner,

Wilson, and Andrews, (Gov't's Opp'n at 5; *see also* Tr. at 2059–62); and climbing over a fence

and through a creek to enter the Housing Project with Petitioner, (Gov't's Opp'n at 5; *see also*

Tr. at 2062–68).  Dennis further testified to entering the Housing Project with Petitioner and

witnessing Petitioner open fire outside of Building 3 of the Housing Project, where several

people were gathered.  (Gov't's Opp'n at 5–6; *see also* Tr. at 2068–72.)  Dennis also testified

that later that night, Petitioner bragged to Dennis's brother about shooting Cokley, saying he had

"clapped Chris Cokley in the head."  (Gov't's Opp'n at 6; *see also* Tr. at 2094.)  The next day,

Dennis and Wilson searched for Petitioner's tossed gun, but they could not find it.  (Gov't's

Opp'n at 6; *see also* Tr. at 2100–02.)

Harris testified that the day after the murder, he bleached clothing found at Williamson's

apartment and gave the bleached clothing to a customer to discard in exchange for crack cocaine.

(Gov't's Opp'n at 6–7; *see also* Tr. at 848–51.)  Harris also testified that in 2011, Petitioner

recounted the story of Cokley's murder in detail to Harris while they were in jail together. (Gov't's Opp'n at 7; *see also* Tr. at 874–78.)  Such details corroborate the testimony of Granger and Dennis, including that Petitioner was wearing a hoodie backwards with holes cut out for the eyes, that Dennis and Petitioner crawled "like ninjas" through the mud to enter the Housing Project, that the shooting occurred within the Housing Project, that Petitioner possessed a .357 revolver and Dennis possessed a 9-millimeter handgun, that Petitioner fled the scene in a car while Dennis ran, and that Petitioner tossed the .357 into the creek before leaving the Housing Project.  (Gov't's Opp'n at 7; *see also* Tr. at 774–78.)

Additional corroborating witnesses testified, including eyewitnesses Angel Kinlaw ("Kinlaw") and Callie Dickerson ("Dickerson"), who were in the Housing Project the night of the murder.  (Gov't's Opp'n at 7.)  Kinlaw testified that she was sitting between Buildings 1 and 3 when she witnessed two individuals wearing dark clothing, with a "mask or hood or something" concealing their faces.  (Gov't's Opp'n at 7; *see also* Tr. at 1788–91.)  Kinlaw recalled that one of the individuals was walking in the street, while one was walking on the sidewalk when they opened fire.  (Gov't's Opp'n at 7; *see also* Tr. at 1792.)  Dickerson also testified that she was in front of Building 3 when she witnessed two men shoot towards the gathering of people.  (*Id.* at 2634–36.)

Six months later, on February 5, 2010, Yonkers Police Department recovered the .357 magnum revolver from Wilson.  (*See* Pet'r's Habeas Mem. at 36.)  While conducting surveillance of the rear yard connected to the back of the buildings at 87 Ash Street in Yonkers, the officers observed Wilson "enter the yard, remove a revolver from inside his jacket, and place the revolver in a wooden shed in the yard."  (*Id*; *see also* Tr. at 2414–15.)

### b.  Verdict, Sentence, & Appeal

On July 1, 2013, Petitioner was convicted of participating in a racketeering organization (Count One); racketeering conspiracy (Count Two); conspiracy to commit murder in aid of racketeering and the substantive murder in connection with the July 2009 murder of Cokley (Counts Three and Four); conspiracy to distribute 280 grams of crack cocaine (Count Seven); and the murder of Cokley and related counts (Counts Eight, Nine, and Ten).  (*See* Judg. 1–2.) Petitioner was acquitted of the remaining charges.  (*See id.*)

On September 29, 2015, the Court sentenced Petitioner to life imprisonment plus 35 years, which he is currently serving.  (*See* Dkt. No. 1099, Case No. 11-CR-630.)

Petitioner filed a notice of appeal to the Second Circuit on October 6, 2015, (Dkt. No. 1110, Case No. 11-CR-630), arguing that the evidence was insufficient to convict him of conspiracy to commit murder in aid of racketeering with the Cokley murder, *see United States v. Andrews, et al.*, 665 F. App'x 86, 88 (2d Cir. 2016) (summary order).  The Second Circuit affirmed Petitioner's conviction on December 6, 2016, *see id.*, and Petitioner did not appeal to the Supreme Court, (*see* Pet. at 3.)

### B.  Procedural History

Petitioner filed the instant Rule 33 Motion on March 3, 2018, (Dkt. No. 1300, Case No. 11-CR-630), and the instant Habeas Petition pursuant to 28 U.S.C. § 2255 on March 5, 2018, (Dkt. No. 1, Case No. 18-CV-1950).  On May 7, 2018, Respondent filed a Memorandum in Opposition to Petitioner's Motion and Petition.  (Dkt. No. 1309, Case No. 11-CR-630.) Petitioner filed a Reply on June 20, 2018.  (Dkt. No. 1321, Case No. 11-CR-630.)  On September 27, 2019, Petitioner filed a motion for leave to file a Supplemental Memorandum of Law, along with his Proposed Supplemental Memorandum of Law.  (Dkt. No. 5, Case No. 18-CV-1950.)

Respondent filed a Response in Opposition on October 11, 2019.  (Dkt. No. 8, Case No. 18-CV-1950.)

## II.  Discussion

### A.  Petition for Writ of Habeas Corpus

#### 1.  Applicable Law

A prisoner in federal custody may move to vacate, set aside, or correct his sentence only "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).[8]  "Because collateral challenges are in 'tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack.'" *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (quoting *Ciak v. United States*, 59 F.3d 296, 301 (2d Cir. 1995)).  To prevail on a collateral attack of a final judgment under § 2255, a petitioner must demonstrate either the existence of a "constitutional error . . . or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice."  *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quotation marks omitted); *accord*

---

[8] 28 U.S.C. § 2255(a) provides, in full:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside[,] or correct the sentence.

*Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000); *Rodriguez v. United States*, No. 11-CV-2957, 2013 WL 6171618, at *3 (S.D.N.Y. Nov. 25, 2013), *aff'd*, 679 F. App'x 41 (2d Cir. 2017).

In ruling on a § 2255 petition, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Moreover, a hearing is not required where the petitioner's allegations are "vague, conclusory, or palpably incredible." *Machibroda v. United States*, 368 U.S. 487, 495 (1962). To justify a hearing, the petition "must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the petitioner] to relief." *Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013).

### 2.  Ineffective Assistance of Counsel

#### a.  Standard of Review

The Sixth Amendment of the United States Constitution provides that a criminal defendant shall enjoy the right to effective assistance of counsel. *See Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam). A claim for ineffective assistance of counsel is analyzed under the two-part test set out by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984): to be entitled to relief, a petitioner must show that (1) his or her attorney's conduct was constitutionally deficient because it fell below an "objective standard of reasonableness," *id.* at 687–88, and (2) the petitioner was prejudiced by the ineffective representation—that is, but for the deficiency, there is a reasonable probability that "the result of the proceeding would have been different," *id.* at 694.

To determine whether counsel's conduct is deficient under the first prong, "the court must determine whether, in light of all of the circumstances, the identified acts or omissions were

outside the wide range of professionally competent assistance." *Lindstadt v. Keane*, 239 F.3d 191, 198–99 (2d Cir. 2001) (alterations and citation omitted). A petitioner cannot meet this prong based solely on disagreements with counsel's strategy or advice. Indeed, there is a "strong presumption" that counsel's conduct fell within the vast spectrum of reasonable assistance, and it is the petitioner's burden to demonstrate "that counsel's representation was unreasonable under prevailing norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *see also Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) ("[W]e have often explained that strategic decisions . . . are entitled to a strong presumption of reasonableness [since] [d]efense lawyers have limited time and resources, and so must choose from among countless strategic options." (quotation marks and citation omitted)); *Henderson v. Martuscello*, No. 10-CV-5135, 2013 WL 6463348, at *15 (S.D.N.Y. Dec. 10, 2013) ("Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, even where counsel adopts a course of action (or inaction) that seems risky, unorthodox[,] or downright ill-advised." (citation and alteration omitted)). Thus, to satisfy this prong, a petitioner must demonstrate that his or her counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In assessing counsel's conduct, "a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citation omitted) (quoting *Strickland*, 466 U.S. at 690).

To satisfy the second prong, "[the petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding below would have been different." *United States v. Caracappa*, 614 F.3d 30, 46 (2d Cir. 2010) (citation

omitted).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding," as "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."  *Id.* at 693 (citation omitted).  "'[P]urely speculative' arguments about the impact of an error do not establish prejudice."  *DeCarlo v. United States*, Nos. 11-CV-2175, 08-CR-523, 2013 WL 1700921, at *4 (S.D.N.Y. Apr. 17, 2013) (alteration in original) (quoting *United States v. Weiss*, 930 F.3d 185, 199 (2d Cir. 1991)).  Moreover, "a court hearing an ineffectiveness claim must consider the totality of the evidence . . . . [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  *Strickland*, 466 U.S. at 695–96.

Finally, the Supreme Court has instructed that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the [petitioner] makes an insufficient showing on one."  *Id.* at 697.

Petitioner has advanced six theories of ineffective assistance of counsel—two for ineffective assistance of trial counsel, and four for ineffective assistance of appellate counsel: (1) trial counsel's failure to move to exclude Exhibit 401, the .357 revolver, (Pet'r's Habeas Mem at 57–59); (2) trial counsel's failure to object to the Government's statement in summation allegedly commenting on Petitioner's failure to testify, (*id.* at 60–61); (3) appellate counsel's failure to appeal the trial court's admission of the Strip Boyz's "Bullets for Riverdale" video, (*id.* at 63–68); (4) appellate counsel's failure to argue that Petitioner's Fifth Amendment rights were violated when the Government allegedly commented on Petitioner's failure to testify, (*id.* at 68–

69); (5) appellate counsel's failure to argue that trial counsel was ineffective for failing to move to exclude Exhibit 401, (*id.* at 69); and (6) appellate counsel's failure to argue that Petitioner should not have received a sentencing enhancement for being a leader, supervisor, organizer, or manager, (*id.* at 69–73).[9]  The Court will consider each theory in turn.

### b.  Infective Assistance of Trial Counsel

### i.  Failure to Move to Exclude Exhibit 401

Petitioner argues that trial counsel's failure to move to exclude Exhibit 401, the .357 magnum revolver, on the grounds that "no sufficient connection between Exhibit 401 and Knowles or the murder of Christopher Cokley had been established," "fell below an objective standard of reasonableness."  (Pet'r's Habeas Mem. at 59.)  Petitioner notes that although Granger "claimed he recognized the brownish handle and the red tip on the gun," "he could not be certain that it was the same gun."  (*Id.* at 58 (citing Tr. at 248).)  "Thus, Exhibit 401 was

---

[9] In Petitioner's Amended Reply, he raises an additional ground of ineffective assistance of appellate counsel: that counsel defaulted in their ethical obligations to use best efforts to appeal Knowles' conviction.  (Pet'r's Am. Reply Mem. in Supp. of Mot. for New Tr. & Pet. for Writ of Habeas Corp. ("Pet'r's Am. Reply") at 22–23 (Dkt. No. 1322, Case No. 11-CR-630).).  However, "Petitioner's failure to raise [this claim] in his original [P]etition . . . precludes [its] consideration."  *Read v. Superintendent Mr. Thompson*, No. 13-CV-6962, 2016 WL 165716, at *11 (S.D.N.Y. Jan. 13, 2016).  Indeed, longstanding Second Circuit precedent instructs courts "'not [to] consider an argument raised for the first time in a reply brief,'"  *United States v. Pocinoc*, 833 F. App'x 847, 849 (2d Cir. 2020) (summary order) (quoting *United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003)), and "this rule is consistently applied in the habeas context," *Williams v. Chappius*, No. 16-CV-8329, 2018 WL 7133267, at *10 (S.D.N.Y. Nov. 16, 2018), *report and recommendation adopted*, 2019 WL 330630 (S.D.N.Y. Jan. 25, 2019), *appeal dismissed*, No. 19-484 (2d Cir. Apr. 29, 2019); *see also Melo v. United States*, 825 F. Supp. 2d 458, 464 (S.D.N.Y. 2011) (noting, in habeas context, that the petitioner waived ineffective assistance of counsel argument "because he raised it for the first time in his [r]eply").  Petitioner cites no authority nor raises any unique circumstance to justify a departure from this precedent. As such, this Court will decline to consider this argument.

entered subject to connection."  (*Id.* (citing Tr. At 406 –07).)  "That weapon," Petitioner argues,

"was never connected to [Knowles] or the murder."  (*Id.*)

The Government counters that there was "ample basis" to admit Exhibit 401.  (Gov't's

Opp'n at 21).  According to the Government, that basis included that "[t]wo witnesses"—

Granger and Dennis—"stated that they believed this was the gun used by Knowles, and the gun

was found after having been possessed by Rakeem Wilson, who according to the cooperating

witnesses had been tasked with hiding the weapon Knowles used."  (*Id.* at 21–22.)  The

Government also clarified that "trial counsel stipulated that there was sufficient connection for

the gun to be admissible, *after* the Government elicited additional circumstantial evidence that

Exhibit 401 was the gun Knowles used on July 4, 2009."  (*Id.* at 22 (emphasis added).)  Further,

"the Government never argued (or attempted to argue) that the gun was definitively that used by

Knowles on July 4, 2009."  (*Id.*)

"[T]rial decisions to offer or stipulate to certain evidence, [and] decisions such as when to

object and on what grounds[,] are primarily matters of trial strategy and tactics, and thus are

virtually unchallengeable absent exceptional grounds for doing so."  *Marcus v. United States*,

No. 14-CV-5780, 2015 WL 3869689, at *16 (E.D.N.Y. June 22, 2015) (quoting *United States v.

Cohen*, 427 F.3d 164, 170 (2d Cir. 2005)).  Notably, here, as the Government points out,

Petitioner's trial counsel *did* initially object to Exhibit 401 being admitted into evidence.

Specifically, the trial transcript reads:

MR. BAUER: The [G]overnment offers 401 into evidence subject to connection.

MR. SCHNEIDER: Objection. . . . [Granger is] not sure it's the same gun.  He said he's
not sure it's the same gun.

MR. BAUER: He said he's pretty certain and that's why it's being offered subject to
connection.

THE COURT: I'm going to overrule the objection subject to connection.  Received. (Tr. at 248.)  Petitioner's trial counsel later stipulated to the admission of Exhibit 401, but only after Dennis testified that Exhibit 401 was the "trey pound"[10] "that Manny used to fire toward the crowd in [the Housing Project]."  (Gov't's Opp'n at 21; *see also* Tr. at 2075–76, 2416.) Dennis believed Exhibit 401 was the same weapon that Petitioner used the night of the Cokley murder because "it was all silver.  The handle was dark.  I ain't really—I don't remember the color of the handle, but I remember like the front of it was all silver."  (Gov't's Opp'n at 21; *see also* Tr. at 2076.).

Petitioner has "not shown any ground for a[] [further] objection by his counsel . . . . The . . . context . . . supported a finding that" Exhibit 401 was the gun used by Petitioner to murder Cokley.  *Nelson v. United States*, Nos. 12-CV-1502, 13-CR-242, 2021 WL 4083387, at *4 (S.D.N.Y. Sept. 8, 2021).  "As such, [Exhibit 401] was properly admitted . . . and was relevant to the issues before the jury.  [Petitioner] has failed to show any deficiency in this regard by [d]efense [c]ounsel."  *Id.* (rejecting argument that the petitioner's counsel was ineffective for failing to object to testimony regarding a phone call the petitioner made because there was no basis for such an objection).  Indeed, "the failure to make a meritless argument does not rise to the level of ineffective assistance."  *Parrilla v. United States*, Nos. 19-CV-9275, 13-CR-360, 19-CV-9756, 19-CV-9416, 2021 WL 4066021, at *4 (S.D.N.Y. Sept. 7, 2021) (quoting *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995)); *see also Daly v. Lee*, No. 11-CV-3030, 2014 WL 1349076, at *20 (E.D.N.Y. Apr. 4, 2014) ("[D]ecisions to forego meritless motions cannot be grounds for claims of ineffective assistance of counsel.").

---

[10] The Court understands "trey pound"—also spelled "tre pound"—to be "[a] slang term for a .357 Magnum firearm, usually a revolver."  *Tre Pound*, URBAN DICTIONARY (Jan. 28, 2009), https://www.urbandictionary.com/define.php?term=Tre%20Pound.

Accordingly, trial "[c]ounsel's decision to not object . . . was a reasonable strategic choice that this Court [will] not second-guess." *Parrilla*, 2021 WL 4066021, at *6. Thus, trial counsel's performance did not fall below an objective standard of reasonableness due to his failure to move for the exclusion of Exhibit 401. *See Strickland*, 466 U.S. at 687–88.

### ii.  Failure to Object to Summation Statement

Petitioner next argues that "[t]rial counsel failed to object to the prosecution's summation, in which AUSA Bauer commented on [Petitioner's] failure to testify. . . . Defense counsel's failure to recognize and object to the violation of his [c]lient's Fifth Amendment rights fell below an objective standard of reasonableness." (Pet'r's Habeas Mem. at 60.)  Specifically, Petitioner points to the following statement made by the Government's attorney during summation:

> MR. BAUER: But the difference between Steven Knowles and Michael Dennis is that Michael Dennis came in here and let it all hang out for you.  He came in here and accepted responsibility for what he did.  He told you about everything he did that night, July 4th; he also told you about everything else that he did.  It was the same for the other co-operators, too.

(*Id.* (quoting Tr. at 2920).)  Petitioner further alleges that the "Court's subsequent [jury] instruction was insufficient to undo [the] damage [wrought by the prosecutor's comment], and Knowles was prejudiced by his attorney's deficient performance in this regard." (*Id.* at 61.)

The Government makes several arguments in response.  First, the Government argues that "the prosecutor's statement was appropriate, and [it] was not commenting on the defendant's failure to testify." (Gov't Opp'n at 24.)   Government also notes that "[t]he challenged statement must be considered in the context of the repeated warnings by the Government that it bore the burden at Knowles' trial, and that Knowles need not present any evidence." (*Id.*)  Second, the Government argues that "[t]he clear thrust of the statement was for the jury to

closely examine Michael Dennis' testimony—rather than castigate Knowles, the purpose was to

note the candor of Dennis." (*Id.*) Third, the Government contends that the Court's jury

instructions were proper. (*Id.* at 25.) Specifically, the Government points to the Court's

reminder before summation that "[t]he Government has the burden of proof . . . [defense

counsel] is going to give a summation, but he doesn't have to, again, because his client does not

have the burden of proof, his client is presumed innocent." (*Id.* (quoting Tr. at 2723.) Further,

the Court instructed the jury that:

> The Defendant did not testify. Under our Constitution, a defendant has no
> obligation to testify or to present any evidence, because it is always the
> Government's burden to prove a defendant guilty beyond a reasonable doubt. That
> burden remains with the Government throughout the entire trial and never shifts to
> a defendant. Therefore, you must not attach any significance to the fact that the
> Defendant did not testify. You may not draw any inference against him because he
> did not take the stand. You may not consider this against the Defendant in any way
> in your deliberations.

(*Id.* (quoting Tr. at 3179).) Finally, as the Government argues, given the overwhelming evidence

of Knowles' guilt, any prejudice that he suffered as a result of the Government's statement was

de minimis. (*See id.*)

Although Petitioner's claim is not without any merit, as previously stated, "decisions

such as when to object and on what grounds are primarily matters of 'trial strategy and

tactics,' . . . and thus are 'virtually unchallengeable absent exceptional grounds for doing so.'"

*Cohen*, 427 F.3d at 170 (quoting *Brown v. Artuz*, 124 F.3d 73, 77 (2d Cir. 1997) and *United

States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004)). Indeed, "whether to object to an arguably

improper remark [in the Government's summation] or to wait and attack it in the defense

summation [is] strictly a matter of tactics." *United States v. Daniels*, 558 F.2d 122, 127 (2d Cir.

1977). In addition, "counsel [also] cannot be criticized for failing to object to the [Court's jury]

instruction because the instruction was consistent with prevailing [constitutional] law." *Daly*,

2014 WL 1349076, at *20.  Given this high bar, trial counsel's performance did not fall below an objective standard of reasonableness simply because he did not object to one short statement in a summation at the end of a multi-week trial.  Accordingly, Petitioner fails to meet the first *Strickland* prong with respect to this issue.

In any event, Petitioner cannot meet the second *Strickland* prong.  "Given that the evidence of [Petitioner's participation in the] conspiracy [to murder Cokley]. . . was overwhelming . . . [the Court] conclude[s] that the failure of [Petitioner's] trial counsel to object to a passing and equivocal statement in summation . . . was neither objectively unreasonable nor prejudicial to [Petitioner's] case."  *Cohen*, 427 F.3d at 171.  Indeed, the Government submitted overwhelming evidence of Petitioner's guilt, including the testimony of cooperating witnesses, the testimony of eyewitnesses, crime scene photographs, ballistics evidence, and surveillance video.  (*See* Gov't Opp'n at 3–4.)  Thus, "[t]hese are not circumstances in which an objection . . . would have had a reasonable probability of altering the result of the proceeding  . . . ."  *United States v. Price*, 443 F. App'x 576, 579 (2d Cir. 2011) (summary order); *see also Fox v. Mann*, 71 F.3d 66, 72 (2d Cir. 1995) (finding that the prosecutor's statement, in which she said, "Your Honor, I am requesting, if the defendant wants to speak, he can take the stand," did not violate the defendant's Fifth Amendment right to silence because, even though it was improper, the defendant "failed to make the required showing of prejudice").  Accordingly, Petitioner's trial counsel was not ineffective for failing to object to the Government's statement in summation.

### c.  Ineffective Assistance of Appellate Counsel

"The standard for ineffective assistance of trial counsel under *Strickland* is also applicable to ineffective assistance of appellate counsel claims."  *Fountain v. Superintendent of Attica Corr. Facility*, No. 14-CV-4782, 2021 WL 3492106, at *4 (E.D.N.Y. Aug. 9, 2021)

(citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). "To state a claim for ineffective assistance of appellate counsel, a petitioner must show (1) 'that his counsel was objectively unreasonable in failing to find arguable issues to appeal' and (2) 'a reasonable probability that, but for his counsel's unreasonable failure' to raise an issue on appeal, 'he would have prevailed on his appeal.'" *Id.* (quoting *Smith*, 528 U.S. at 285). "The *Strickland* standard is difficult to meet in any procedural context, and perhaps especially so when the claim is that a lawyer failed to make an argument on direct appeal." *Carrasco v. Miller*, No. 17-CV-7434, 2020 WL 9256469, at *19 (S.D.N.Y. Nov. 13, 2020), *report and recommendation adopted*, 2021 WL 1040473 (S.D.N.Y. Mar. 18, 2021). Appellate counsel "need not raise every plausible claim and has a wide degree of professional discretion to choose which issues to raise." *Lynch v. Dolce*, 789 F.3d 303, 319 (2d Cir. 2015) (citing *Jones v. Barnes*, 463 U.S. 745, 754 (1983)).

### i.  Failure to Appeal Admission of Strip Boyz's Rap Video

Petitioner argues that his appellate counsel was ineffective for failing to appeal the Court's admission of the Strip Boyz's rap video entitled "Bullets for Riverdale." (Pet'r's Habeas Mem. at 63–68.) The lyrics of the song include the following verse:

> Bullets for Big Croc[11] (gunshot)
> Bullets for Manny Fresh[12] (gunshot)
> They said we back goons, tell him sh—, we never left
> Of course we got shots for Elm
> Strip Boyz you know beef ain't a problem
> Long time overdue, should have been solved 'em
> Bullets for Big Croc (gunshot)
> Bullets for Manny Fresh (gunshot)
> Ya'll n— started a war and it will never stop.

---

[11] "Big Croc" refers to Equilla Ross, a member of the Elm Street Wolves. (Gov't's Opp'n at 26; *see also* Tr. at 95–96.)

[12] Knowles was also known as "Manny Fresh." (Indict. ¶ 1.)

(Tr. at 18.)  The Court found—over Knowles's trial counsel's strenuous objection[13]—that the

video was admissible against Knowles as indicative of the state of mind of the Strip Boyz.

(Gov't's Opp'n at 26; Tr. at 17–22.)  Specifically, the Court stated:

> The bottom line is that this rap is part of, really it's almost a narrative of what has to be going on, and what the Strip Boyz wanted to continue going on in terms of escalating the violence not just against the Wolves but specifically directed at Mr. Knowles.  There is plenty of proof . . . about the escalation of the violence involving Knowles and Cokley, let alone the Strip Boyz, and the Wolves with Knowles being a part of that.  It certainly comes in with respect to what the state of mind was of the Strip Boyz.  It comes in also because to the extent that it puts into context what it is the [G]overnment says that Knowles ultimately did, and that there was violence committed by the [Strip Boyz] against Knowles, there's an episode where he gets beaten up, so it's part of the chronology, it's part of the story.

(Tr. at 19–20.)  The Court further ruled that the video was not unduly prejudicial under Federal

Rule of Evidence 403:

> In terms of 403, you know, at the end of the day I think this is highly relevant.  I can't imagine anything being more relevant.  If a rap song ever was relevant to a case that is it.  In terms of its undue prejudice, all it does is describe what was going on and what the Strip Boyz wanted to continue going on and it led to Cokley dying.

(*Id.* at 20.)  The Government argues that Petitioner "simply repeats the arguments [trial counsel]

made that were rejected by this Court," (Gov't's Opp'n at 26), namely that (1) "the Court erred

in finding that the video was admissible under the state of mind exception to the hearsay rule,"

and (2) the video was inadmissible under Rule 403 of the Federal Rules of Evidence," (Pet'r's

Habeas Mem. at 64–68.)

   "[A]ppellate counsel is permitted to exercise professional judgment when determining

which issues to pursue on appeal."  *Quail v. Farrell*, 550 F. Supp. 2d 470, 477 (S.D.N.Y. 2008).

---

[13]   The Trial Transcript reflects trial counsel's vigorous arguments for the exclusion of the "Bullets for Riverdale" on the record.  (*See* Tr. at 18–22.)  The Court also noted that it would allow the video to come in despite the "excellent letter" that Petitioner's trial counsel submitted arguing for its exclusion.  (Tr. at 19; *see also id.* at 22.)

"Indeed, the Supreme Court has recognized that truly effective appellate advocacy entails 'winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.'" *Id.* (quoting *Jones*, 463 U.S. at 751–52).  Further, the Second Circuit has found that "[i]n attempting to demonstrate that appellate counsel's failure to raise a state claim constitutes deficient performance, it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." *Mayo*, 13 F.3d at 533.

Here, the Court ruled that despite trial counsel's efforts, the argument for the exclusion of the rap video was ultimately meritless because it went to the state of mind of the Strip Boyz and was not unduly prejudicial toward Petitioner.  (*See* Tr. at 17–22.)  "Where a claim lacks merit, an attorney's failure to preserve it cannot be ineffective assistance of counsel."  *Trudeau v. United States*, No. 16-CV-273, 2017 WL 11527600, at *6 (D. Conn. Apr. 13, 2017) (citing *Parker v. Ercole*, 666 F.3d 830, 835–36 (2d Cir. 2012)); *see also Quail*, 550 F. Supp. 2d at 476 ("The failure to preserve a meritless claim cannot constitute ineffective assistance of counsel.").  In *Carneglia v. United States*, the court rejected the petitioner's ineffective assistance claim where appellate counsel did not object to the admissibility of certain recorded conversations because "the statements appear relevant," the statements were not hearsay as statements of a co-conspirator made during the course of and in furtherance of the conspiracy, and "there was substantial other evidence establishing the petitioner's guilt."  No. 03-CV-6388, 2006 WL 148908, at *6 (E.D.N.Y. Jan. 18, 2006).  Similarly, here, the Strip Boyz rap video was relevant, (Tr. at 20 ("I can't imagine anything being more relevant")), and not hearsay, (*id.* at 22 (finding the video was "not inadmissible hearsay")).  And, as described above, the Government submitted overwhelming evidence of Petitioner's guilt, including the testimony of cooperating witnesses,

21

the testimony of eyewitnesses, crime scene photographs, ballistics evidence, and surveillance video. (*See* Gov't's Opp'n at 3–4.) Petitioner therefore "suggests no legal basis upon which the trial court's admission of this evidence should be disturbed." *Carneglia*, 2006 WL 148908, at *6. Thus, Petitioner's ineffective assistance claims with respect to the rap video fail both *Strickland* prongs.

<u>ii.  Failure to Appeal Summation Statement</u>

Petitioner argues that appellate counsel was ineffective by "fail[ing] to address" the alleged constitutional violation that occurred when the Government allegedly commented on Knowles' failure to testify. (Pet'r's Habeas Mem. at 69; *see id.* at 68.) The Government argues that "because Knowles' trial counsel was not ineffective, and Knowles did not suffer actual prejudice, from the failure to object to the Government's supposed comment on Knowles failure to testify . . . his appellate counsel similarly did not perform ineffective assistance by failing to raise those issues on appeal." (Gov't's Mem. at 27.) The Court agrees with the Government.

As discussed above, the Court found that the Government's comment in summation did not violate Petitioner's Fifth Amendment Rights. *See supra.* Moreover, "[t]he Court reviewed these claims and has determined that [] [P]etitioner suffered no prejudice as a result of the alleged ineffectiveness of trial counsel. Therefore, [] [P]etitioner was not prejudiced by his appellate lawyer's failure to raise the identical claims on appeal." *Carneglia*, 2006 WL 148908, at *6. Thus, for the same reasons that the Court declined to find that Petitioner's trial counsel was not ineffective for failing to object to the Government's comment in summation at the trial level, the Court also finds that Petitioner's appellate counsel was not ineffective for failing to raise the same argument on appeal.

### iii.  Failure to Appeal Admission of Exhibit 401

Petitioner next argues that appellate counsel was ineffective for failing to appeal the admission of Exhibit 401, the .357 magnum revolver.  (*See* Pet'r's Habeas Mem. at 69.)  The Government argues again that "because Knowles' trial counsel was not ineffective, and Knowles did not suffer actual prejudice . . . from the failure to exclude Exhibit 401, his appellate counsel similarly did not perform ineffective assistance by failing to raise those issues on appeal." (Gov't Mem. at 27.)  Again, the Court agrees with the Government.  For the same reasons that the Court found that Petitioner's trial counsel was not ineffective for failing to further object to the admission of Exhibit 401, the Court also finds that Petitioner's appellate counsel was not ineffective for failing to make the same argument on appeal.

### iv.  Failure to Appeal Sentencing Enhancement

Finally, Petitioner argues that appellate counsel was ineffective for failing to argue that Knowles should not have received a sentencing enhancement for being a leader, supervisor, organizer, or manager.  (*See* Pet'r's Habeas Mem. at 70–73.)  Petitioner refers to § 3B1.1 of the Federal Sentencing Guidelines, which provides:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.
>
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.
>
> (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

U.S. Sent'g Guidelines Manual § 3B1.1 (U.S. Sent'g Comm'n 2014) (bold in original).  In the instant case, the Court applied a four-level enhancement based on Petitioner's leadership role

in the Elm Street Wolves.  (*See* Sentencing Tr. at 17 (Dkt. No. 1099, Case No. 11-CR-630).)

The Court applied the leadership enhancement after the following analysis:

> I recognize, as [Petitioner's counsel] points out, that this was not an organization that had a very strict hierarchical structure, it's not as if people carry titles, it's not as if there was some sort of smoking gun that said, here's the structure of the organization, but that being said, there was ample testimony about Mr. Knowles, not only his leadership role but the evolution of how he obtained that role.  So he did put in the most amount of work and was quite literally calling the shots in terms of how the Wolves are going to react to certain beefs with the Strip Boyz and who was going to be able to sell [drugs] in the Wolves area.
>
> In fact, the evidence was really quite overwhelming on this point.  So I think that the enhancement is appropriate and that's the Court's finding by a preponderance of the evidence noting that the evidence would have supported an even higher burden in that regard.

(*Id.* at 7.)  Petitioner argues that "the contentions of some witnesses that Knowles was the leader is contradicted by other testimony," and "Knowles may have been shown to have been an organizer of some acts, although we dispute that contention, but there is no evidence that he led the overall group of Elm Street Wolves."  (Pet'r's Habeas Mem. at 72–73.)

As the Court noted during sentencing, if "contested information is relevant to the potential sentence, then it need only be proven by a preponderance of evidence."  *United States v. Vanier*, No. 18-CR-873, 2021 WL 5989773, at *6 (S.D.N.Y. Dec. 17, 2021).  And, the Court found that "the evidence" that Knowles was a leader of the Elm Street Wolves "would have supported an even higher burden."  (Sentencing Tr. at 7.)  The Second Circuit has affirmed a district court's "factual findings as to the relevant conduct for sentencing" when, "faced with two contradictory accounts . . . each feasible and each supported by eyewitness testimony and circumstantial evidence," the district court "resolv[ed] [the] conflict in the government's favor."  *United States v. Ruggiero*, 100 F.3d 284, 292 (2d Cir. 1996), *cert. denied*, 522 U.S. 1138 (1998); s*ee also Aboushi v. United States*, No. 05-CV-1244, 2005 WL 3369094, at *2 (E.D.N.Y.

Dec. 12, 2005) (denying ineffective assistance claim for failure to appeal sentencing

enhancements where "many of the enhancements were based on the [c]ourt's findings of fact,

which would have been reviewed only for clear error on appeal," explaining that the petitioner

"failed to demonstrate that his appellate counsel acted objectively unreasonably in deciding not

to raise issues subject to this stringent standard of review"); *cf. Melicharek v. United States*,

Nos. 09-CV-8542, 07-CR-907, 2010 WL 1948492, at *4 (S.D.N.Y. May 13, 2010) (denying

ineffective assistance claim for trial counsel's failure to challenge sentencing enhancements

where "the Government would have been able to prove" them, and, "[g]iven the evidence of [the

petitioner's] role in the [underlying crimes], challenging the managerial role enhancement would

have been . . . fruitless"). Here, where the Court found during sentencing that the Government

proved Petitioner's leadership role by *more* than a preponderance of the evidence despite defense

counsel's arguments to the contrary, (*see* Sentencing Tr. at 7), and where those findings of fact

are reviewed only for clear error on appeal, *see Aboushi*, 2005 WL 3369094, at *2, it cannot be

said that appellate counsel's performance fell below an objective standard of reasonableness by

choosing not to pursue the issue further on appeal, *see Strickland*, 466 U.S. at 687–88.

### 3. Prosecutorial Misconduct

"To secure relief from conviction based on prosecutorial misconduct, a defendant must

show that the misconduct resulted in 'substantial prejudice by so infecting the trial with

unfairness as to make the resulting conviction a denial of due process.'" *United States v. Aquart*,

912 F.3d 1, 27 (2d Cir. 2018) (quoting *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002)),

*cert. denied*, 140 S. Ct. 511 (2019). The Second Circuit has found that to find substantial

prejudice, courts must consider "[1] the seriousness of the misconduct, [2] the measures adopted

by the trial court to cure the misconduct, and [3] the certainty of conviction absent the improper

statements." *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) (brackets in original) (quoting *United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990)); *see also Floyd v. Meachum*, 907 F.2d 347, 355 (2d Cir. 1990) (same).  In making this determination, "[t]he [C]ourt considers the record as a whole when making this determination, 'because even a prosecutor's inappropriate or erroneous comments or conduct may not be sufficient to undermine the fairness of the proceedings when viewed in context.'"  *Mesko v. Lilley*, No. 18-CV-872, 2019 WL 6493976, *9 (N.D.N.Y. Dec. 3, 2019) (quoting *Jackson v. Conway*, 763 F.3d 115, 146 (2d Cir. 2014)).

a.  Summation Statement

"The test governing whether a prosecutor's statements amount to an improper comment on the accused's silence in violation of the Fifth Amendment looks at the statements in context and examines whether they naturally and necessarily would be interpreted by the jury as a comment on the defendant's failure to testify."  *United States v. Whitten*, 610 F.3d 168, 199 (2d Cir. 2010) (quoting *United States v. Knoll*, 16 F.3d 1313, 1323 (2d Cir. 1994)).

Petitioner argues that the prosecutor commented on Knowles' failure to testify in violation of his Fifth Amendment rights, and that the Court's instructions to the jury were insufficient to cure the prejudice to Petitioner.  (*See* Pet'r's Habeas Mem. at 51.)  In response, the Government appears to argue that "[t]he challenged statement must be considered in the context of the repeated warnings by the Government that it bore the burden at Knowles' trial, and that Knowles need not present any evidence," and thus the comment would not have "naturally and necessarily" been "interpreted by the jury as a comment on the defendant's failure to testify."[14]

---

[14]  The Government does not make an independent argument regarding its summation statement in the context of prosecutorial misconduct.  Rather, the Government only addresses it in the context of Petitioner's ineffective assistance arguments.  (*See* Gov't's Opp'n at 23–25.)

(Gov't's Opp'n at 24 (quoting *Whitten*, 610 F.3d at 199).)  The Government further argues that

the "clear thrust of the statement was for the jury to closely examine Michael Dennis'

testimony—rather than castigate Knowles, the purpose was to note the candor of Dennis."  (*Id.*)

Petitioner's claim is not without any basis, but it is not enough to justify granting the Petition.

"It is a 'rare case' in which [a court] will identify a prosecutor's summation comments,

even if objectionable, as so prejudicial as to warrant relief from conviction."  *Aquart*, 912 F.3d at

27 (quoting *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992)); *see also Cohen*, 427

F.3d at 170 ("[T]he Government has broad latitude in the inferences it may reasonably suggest to

the jury during summation." (quotation marks omitted)).  "Precisely because [summations]

frequently require improvisation, courts will not lightly infer that every remark is intended to

carry its most dangerous meaning."  *Aquart*, 912 F.3d at 27 (quotation marks omitted) (quoting

*United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011)).  Here, the Court can interpret the

Government's statement in summation in one of two ways: (1) either as a comment on

Petitioner's decision not to testify, or (2) as a comment on Dennis' credibility and a plea to the

jury to credit Dennis' version of events over the version presented by Knowles' counsel at trial.

The Court will not infer the "most dangerous meaning," *id.*, of this statement—namely, that it

was a comment on Knowles' decision not to testify.

In *United States v. Rosario*, the Second Circuit found in a summary order that the

prosecution's statements in summation were not improper where they were a response to an

argument made by the defense.  652 F. App'x 38, 40 (2d. Cir. 2016) (summary order).

Specifically, the defense argued that "cell site evidence was unreliable because the government

---

Because the arguments are substantively similar, the Court will assume that the arguments apply
to both contexts.

had not introduced such evidence for the cooperating witness, which could have given the jury confidence in the reliability of the evidence." *Id.*  In response, the prosecutor argued in summation:

> And I want to address one thing.  You don't have [the cooperating witness's] cell site.  Fine.  You know why you don't need it?  Because she admitted to everything she did.  You don't need her cell site data to tell you where she was because she sat up there and she told you.  She told you where she was.

*Id.* (alteration in original).  The Second Circuit found that "[t]hese comments would not naturally and necessarily be interpreted by the jury as a comment on the defendant's failure to testify, but rather as a response, albeit not entirely artful or on point, to the defense's argument." *Id.*  *Rosario* is analogous to the instant case, where, as discussed, the less "dangerous meaning" of the Government's argument is that AUSA Bauer's statement was made in response to defense counsel's attempts to discredit Knowles' cooperators—specifically Dennis—during cross examination.  (*See* Gov't's Opp'n at 24.)

As in *Rosario*, the Court is not concluding that AUSA Bauer's statement was necessarily "artful or on point."  *Rosario*, 652 F. App'x at 40.  However, "th[e] Court is not required to conclude that the [alleged prosecutorial] misconduct 'could not have had any effect whatever;' rather, the issue is whether the misconduct was relatively 'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'"  *Ogletree v. Graham*, 559 F. Supp. 2d 250, 260 (N.D.N.Y. 2008) (quoting *United States v. Zackson*, 12 F.3d 1178, 1184 (2d Cir. 1993)).  Here, where the cooperating witness's testimony was corroborated by eyewitness testimony, ballistics evidence, and surveillance video, and where the statement in question was a small comment that was part of a multi-day summation, the Court concludes that any impact that the statement had was relatively unimportant compared to everything else the jury considered.

Moreover, any impact that the Government's statement may have had was cured by the Court's clear instruction, excerpted above, that Knowles' decision not to testify may not be used against him.  This included, among many instructions, the admonition: "Therefore, you must not attach any significance to the fact that the Defendant did not testify.  You may not draw any inference against him because he did not take the stand.  You may not consider this against the Defendant in any way in your deliberations." (Gov't Opp'n (quoting Tr. at 3179).)  *See Tankleff v. Senkowski*, 135 F.3d 235, 253 (2d Cir. 1998) (*"*[T]he standard instructions given by the trial court were probably sufficient to cure any harm that the prosecutor's misstatements may have caused."); *cf. Barill v. Artus*, 511 F. Supp. 3d 394, 407 (W.D.N.Y. 2020) ("[E]ven if the prosecutor's comments were improper, the trial court issued a [curative] jury instruction . . . [which] the jury presumably followed . . . ."); *Moody v. Comm'r of Corr.,* No. 11-CV-1109, 2014 WL 1690386, at *8 (D. Conn. Apr. 29, 2014) (holding that habeas relief for prosecutorial misconduct was not warranted given "the curative measures utilized to cure the misconduct"); *Williams v. Duncan*, No. 03-CV-568, 2007 WL 2177075, at *29 (N.D.N.Y. July 27, 2007) ("Even assuming, arguendo, the prosecutor's statement . . . was improper, the [court's] jury charges rendered these comments harmless and cured any possible prejudice to [the] [p]etitioner." (italics omitted)); *Barnett v. United States*, 870 F. Supp. 1197, 1206 (S.D.N.Y. 1994) (noting that claim of prosecutorial misconduct was "meritless" because the court "immediately issued a corrective instruction").  Thus, the Court declines to grant Petitioner relief on the basis of his claim that the Government's statement in summation violated his Fifth Amendment rights.

b.  Coercion of False Testimony

Petitioner argues that the Government coerced false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959).  (*See* Pet'r's Habeas Mem. at 51–55.)  The main thrust of Petitioner's argument is that the Government coerced the testimony of Jamar Manners ("Manners"), a member of the Elm Street Wolves who testified as a cooperating witness during Petitioner's trial.  (*Id.*; *see also id.* at 23.)  During trial, Manners testified that he and Knowles "sold guns and possessed drugs together."  (Pet'r's Habeas Mem. at 23; *see also* Tr. at 1292.) "He claimed that Knowles was a shooter of rival gang members."  (Pet'r's Habeas Mem. at 23; *see also* Tr. at 1269.)  Manners testified that, in the early 2000s, when he lived with Knowles for a few months, he "saw Knowles with guns a few times, saw him shoot once," and "claimed that Knowles had .357s and .9s, which he kept under his mattress."  (Pet'r's Habeas Mem. at 23; *see also* Tr. at 1301–06.)  Manners also testified about the alleged 2010 attempted murder of Jose Cruz ("Cruz"), (*see* Indict. ¶¶ 34–37, 45), of which the jury found Petitioner not guilty, (Judg. 1– 2).  Manners testified that he "did not see if Petitioner . . . went in the same direction as [Cruz] when they got out of the car. . . . [Manners also testified that] [h]e got out of the car[] to try to intercept [Cruz] if he came his way, when he heard shots fired, a girl screaming, and sirens." (Pet'r's Habeas Mem. at 24; *see also* Tr. at 1379, 1381.)  Manners also "claimed that he wanted people to think he shot [Cruz] in order to protect Knowles."  (Pet'r's Habeas Mem. at 24; *see also* Tr. at 1386–87.)

Petitioner attached an undated and unnotarized affidavit signed by Manners to his Petition.  (Pet'r's Habeas Mem. Ex. F ("Manners Affidavit") (Dkt. No. 2-6, Case No. 18-CV-1950).)  The affidavit states in relevant part:

> I cooperated with the federal government from 2010 until 2014, and testified at the trial of Steven Knowles on behalf of the United States Attorney's office. . . . As

part of my cooperation, I engaged in numerous proffers with the Government from 2010 until 2014. . . . During those proffers, several things that I found improper, and which I wanted no part of, occurred. . . . I did not want to testify as the Government suggested, but a prosecutor named Jessica Ortiz threatened on several occasions that she would put me in prison for the rest of my life if I did not. . . . The Government asked me on several occasions if I'd ever seen Knowles sell or bag up crack cocaine.  I informed Ms. Ortiz that on one or two occasions, when we were about fourteen or fifteen (15) years of age, I had seen him involved in crack sales and bagging, but not since. . . . The prosecutor threatened that I would lose all the benefit of my cooperation in [another] case if I did not testify against Knowles, and state the things that the Government wanted me to say. . . . In the end, I testified against Steven and did say some of the things the Government wanted to hear. . . . [O]ne thing I can say is that Steven Knowles is not a killer.  I have been around Mr. Knowles in different states; we've slept in the same bed.  I know him better than anybody. . . I know Steven Knowles has made some bad decisions, as we all have.  But he is not a killer."

(*Id.* ¶¶ 3–6, 8, 11, 15–16.)

In addition, Petitioner appears to argue that the Government coerced Sharonda Glover ("Glover"), an eyewitness who did not testify at Petitioner's trial, into signing a statement. Though Glover did not testify, other witnesses at trial mentioned her.  (Gov't's Opp'n at 19.) For example, Dennis and Dickerson "both testified that Ms. Glover spoke with Dennis and Knowles right before they began shooting."  (*Id.*; *see also* Tr. at 2071, 2631.)  According to Petitioner, Glover signed a statement at the U.S. Attorney's Office which "averred that Knowles was one of the shooters."  (Pet'r's Habeas Mem. at 54 n.16).  Petitioner claims that Glover "informed the agents and the Government that the shooters had completely different builds than Knowles and she was sure he was not there," but signed the statement anyway "on threat of having Child Protective Services take her child."  (*Id.*)  Petitioner claims that, though Glover would not sign an affidavit confirming that she was coerced, she allegedly admitted it during an interview with Glenn Colyer ("Coyler"), a private investigator for Petitioner.  (*Id.*) Petitioner attached what is allegedly a transcript of this recorded conversation to his Petition.  (Pet'r's Habeas Mem. Ex. G ("Glover Interview Tr.") (Dkt. No. 2-7, Case No. 18-CV-1950).)

31

The Government argues that because Petitioner did not raise these arguments either at trial or on appeal, and because he does not either (1) show cause and actual prejudice or (2) actual innocence, the claims are procedurally defaulted. (Gov't's Opp'n at 16–17.) *See also Cox v. United States*, 783 F.3d 145, 150 (2d Cir. 2015) ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent."); *Yick Man Mui*, 614 F.3d at 54 (the procedural default rule "prevents claims that could have been brought on direct appeal from being raised on collateral review absent cause and prejudice"); *Marone v. United States*, 10 F.3d 65, 67 (2d Cir. 1993) ("In order to raise a claim that could have been raised on direct appeal, a § 2255 petitioner must show cause for failing to raise the claim at the appropriate time and prejudice from the alleged error.").[15]

With respect to Manners, Petitioner cannot show either cause and prejudice or actual innocence. "Although the precise definition of cause is not settled, the Supreme Court has delineated three circumstances constituting sufficient cause for habeas review of a claim

---

[15] The Court notes that Petitioner's other claims are not procedurally barred, even though he did not raise them at trial or on appeal. Petitioner's ineffective assistance of appellate counsel claims are not procedurally defaulted because Petitioner could not have raised those claims on appeal. Petitioner's ineffective assistance of trial counsel claims are not procedurally barred due to the Supreme Court's decision in *Massaro v. United States*, 538 U.S. 500 (2003), "which created a bright-line exception to the procedural default rule for ineffective assistance claims." *United States v. Peirce*, Nos. 06-CR-1032, 11-CV-2526, 2011 WL 4001071, at *4 (S.D.N.Y. Aug. 30, 2011). As for Petitioner's prosecutorial misconduct claim based on the prosecution's summation statement, the Government appears to concede that it is not procedurally barred because Petitioner "raise[d] [it] both as a free-standing claim and under the rubric of ineffective assistance . . . ." (Gov't's Opp'n at 16.) *See Belgrave v. Graham*, No. 10-CV-5168, 2014 WL 12746908, at *5 (E.D.N.Y. Nov. 24, 2014) ("[I]neffective assistance of counsel on *direct appellate* review could amount to cause, excusing a defendant's failure to raise (and thus procedurally defaulting) a constitutional claim [on appeal]." (alteration in original) (quoting *Trevino v. Thaler*, 569 U.S. 413, 422 (2013))), *report and recommendation adopted*, 2017 WL 4736731 (E.D.N.Y. Oct. 19, 2017).

otherwise barred by a state procedural default." *Austin v. Comm'r of Corr.*, 814 F. Supp. 233, 235 (D. Conn. 1992).  Cause may be found (1) "when a petitioner can show that an objective factor external to the defense impeded compliance with the state's procedural rule," *id.* (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)), (2) "when a petitioner's claim is 'so novel that its legal basis [was] not reasonably available to counsel' at a time when the procedural default could have been avoided," *id.* at 235–36 (alteration in original) (quoting *Reed v. Ross*, 468 U.S. 1, 16 (1984)), or (3) "when trial counsel's failure to raise the federal claim constituted ineffective assistance of counsel under the Sixth Amendment to the United States Constitution," *id.* at 236 (citing *Coleman v. Thompson*, 501 U.S. 722, 753–54 (1991)).  "[T]he petitioner bears the burden of showing cause for his failure to raise [a] claim . . . and prejudice arising therefrom." *Leecan v. Meachum*, 822 F. Supp. 54, 56 (D. Conn. 1993); *id.* at 57 (dismissing claim as procedurally defaulted where petitioner was unable to show cause).

The Government argues that Petitioner cannot show cause because Manners' affidavit is not dated, "which means that Knowles provides no evidence that Knowles did not learn of the alleged Government coercion before or during his appeal."  (Gov't Opp'n at 16.)  Indeed, Petitioner has not explained why he could not have raised this issue during trial or on appeal in any of the three ways delineated by the Supreme Court—objective external factor, novel legal argument, or ineffective assistance.  *See United States v. Corley*, Nos. 13-CR-48, 18-CV-5050, 18-CV-9280, 2020 WL 4676650, at *11 (S.D.N.Y. Aug. 11, 2020) (finding claim procedurally barred where the petitioner did "not put forward any cause for not raising these arguments on appeal").  Petitioner has therefore not met his burden to show cause.  And, "[b]ecause [P]etitioner has failed to show cause for his procedural default, it is unnecessary to determine whether his counsel's performance prejudiced petitioner." *Leecan*, 822 F. Supp. at 57.

Neither can Petitioner show actual innocence. "In order to demonstrate his actual innocence, [a petitioner] must prove his 'factual innocence, not mere legal insufficiency,' and 'demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.'" *Corley*, 2020 WL 4676650, at *11 (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)); *see also Rose v. United States*, Nos. 15-CR-594, 19-CV-3974, 2019 WL 6498210, at *4 (S.D.N.Y. Dec. 3, 2019) (same); *accord Sweet v. Bennett*, 353 F.3d 135, 142 (2d Cir. 2003) ("[T]he question depends on whether it is more likely than not that no reasonable juror would have concluded that [the petitioner] engaged in conduct that meets the required elements of each of the charges."). The Government argues, contrary to the Petitioner's assertion that Manners' testimony "contributed substantially to Knowles' conviction," (Pet'r's Habeas Mem. at 54), Manners' "recantation is irrelevant to the charges for which Knowles was convicted," (Gov't's Opp'n at 18), and as such, Petitioner cannot show that it is more likely than not that no reasonable juror would have convicted him without Manners' testimony. That is because, as the Government notes, Manners testified primarily about "his overall knowledge of Knowles and the Elm Street Wolves" and "the attempted murder of Jose Cruz," of which, as discussed above, Knowles was acquitted. (*Id.*) Additionally, as the Court discussed above, "the evidence of [Petitioner's] guilt at trial was overwhelming, and th[e] [actual innocence] exception therefore cannot salvage these arguments." *Corley*, 2020 WL 4676650, at *11; *see also Green v. Chappius*, No. 17-CV-3129, 2019 WL 7811271, at *10 (S.D.N.Y. Nov. 27, 2019) ("In light of . . . the overwhelming evidence against [the petitioner] in the record, the [c]ourt respectfully recommends finding that [the] [p]etitioner cannot rely on the actual innocence exception."), *report and recommendation adopted*, 2020 WL 495497 (S.D.N.Y. Jan. 30, 2020); *Velez v. Walsh*, No. 07-CV-1037, 2010 WL 519816, at *3 (E.D.N.Y. Feb. 9, 2010) (rejecting actual

innocence claim where "the overwhelming evidence of [the] [p]etitioner's guilt presented at trial was provided by eyewitness accounts of the victim's shooting"); *Glover v. Herbert*, 431 F. Supp. 2d 335, 342 (W.D.N.Y. 2006) (declining to find actual innocence where there was "compelling" and "overwhelming" evidence of the defendant's guilt); *Rosario v. United States*, No. 04-CV-467, 2005 WL 8157497, at *3 (N.D.N.Y. Jan. 26, 2005) ("Any argument of actual innocence must be rejected in light of the overwhelming evidence of [the] [p]etitioner's guilt.").

For the same reasons, Petitioner also fails to show cause or actual innocence in connection with the claim that the Government allegedly coerced Glover into signing a statement. As an initial matter, Petitioner did not meet his burden to show cause. Petitioner does not put forth any explanation for why he did not raise this issue either at trial or on appeal and thus fails to meet his burden. Petitioner's actual innocence theory fares no better. The Government argues that "any statements made by Ms. Glover to the Government are not relevant to the trial in which Mr. Knowles was convicted, for the simple reason that Ms. Glover did not testify at that trial, and any recantation of such statements could not change the result of the trial." (Gov't's Opp'n at 19.) The Government further argues that, in any event, "it is not clear from the transcript submitted by Knowles' investigator that Ms. Glover understood what she was being asked or whether she was actually recanting prior statements regarding whether Knowles was involved in the shooting." (*Id.* at 19–20.) The Court agrees. Given that it is not entirely clear from the transcript exactly what Glover appears to be recanting, and given the fact that Glover did not even testify at trial, Petitioner cannot show that it was more likely than not that no reasonable juror would have convicted him without Glover's statement to the Government. Thus, this claim also fails. *See Perez v. Superintendent, Attica Corr. Facility*, No. 19-CV-5547, 2020 WL 11627180, at *12 (S.D.N.Y. Oct. 5, 2020) ("[The] [p]etitioner makes no meaningful

attempt to show . . . cause for failing to raise the prosecutorial misconduct claims in his direct appeal . . . , prejudice, or actual innocence. . . . Thus, these claims . . . also should be dismissed."), *report and recommendation adopted*, 2021 WL 4710789 (S.D.N.Y. Oct. 8, 2021).

In any event, Petitioner's coercion claims fail on the merits. "The Supreme Court has recognized that the use of a witness's false testimony can violate a defendant's due process rights." *Cotto v. Fischer*, No. 09-CV-9813, 2012 WL 5500575, at *29 (S.D.N.Y. Aug. 23, 2012) (citing *Napue*, 360 U.S. at 267–69), *report and recommendation adopted*, 2012 WL 5499890 (S.D.N.Y. Nov. 12, 2012); *see Read v. Thompson*, No. 13-CV-3661, 2016 WL 165715, at *12 (S.D.N.Y. Jan. 13, 2016) (same); *see also Napue*, 360 U.S. at 269 ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment . . . ."). "[W]hen a trial has been tainted by false testimony, [a] [c]ourt is 'called upon to strike a fair balance between the need for both integrity and finality in criminal prosecutions' by determining whether false testimony was prejudicial in the sense that it affected the outcome of the trial." *United States v. Stewart*, 433 F.3d 273, 297 (2d Cir. 2006) (quoting *United States v. Stofsky*, 527 F.2d 237, 239 (2d Cir. 1975)); *see also Smalls v. Lee*, No. 12-CV-2083, 2016 WL 5334986, at *15 (S.D.N.Y. Sept. 22, 2016) (same). The Court must ask whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Stewart*, 433 F.3d at 297 (citation omitted); *see also United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (same).

There is no reasonable likelihood that Manners' allegedly false testimony "could have affected the judgment of the jury." *Wallach*, 935 F.2d at 456. "[T]raditionally the recantation of testimony given on trial is looked upon with the utmost suspicion." *Buari v. Kirkpatrick*, 753 F. Supp. 2d 282, 293 (S.D.N.Y. 2010) (alteration in original) (quoting *Sanders v. Sullivan*, 863

F.2d 218, 225 (2d Cir. 1988)); *see also United States v. Serafin*, 391 F. App'x 973, 975 (2d Cir.

2010) (summary order) (same).  This is particularly true here, where Manners and Knowles are

associates, so Manners' recantation might therefore be driven by a desire to help his friend.  *See*

*Colvin v. Bunn*, No. 15-CV-323, 2017 WL 4923002, at *5 (W.D.N.Y. Oct. 31, 2017) ("In this

particular case, the circumstances surrounding [the witness's ] recantation further enhance the

unreliability of his statements—in particular, the fact that [the witness] and [the] petitioner are

friends . . . [is a] significant indicator[] that [the witness] may have been motivated by a desire to

aid [the] petitioner.").  In addition, the Government argues that because Manners' allegations are

vague, it is difficult to determine exactly what he supposedly lied about at trial or what testimony

was allegedly false.  (*See* Gov't's Opp'n at 18.)

Indeed, it is not clear which testimony Manners wants to recant.  For example, if Manners

attempted to recant the portion of his testimony relating to Petitioner's alleged attempted murder

of Cruz, that testimony is irrelevant to Petitioner's conviction, because Petitioner was acquitted

of those charges.[16]  *See United States v. Seabrook*, 467 F. Supp. 3d 171, 179 (S.D.N.Y. 2020)

(denying motion for a new trial based on the defendant's allegation of a trial witness's perjury

where the defendant's claims were "insufficiently specific" and "insufficiently substantiated"),

*aff'd*, 814 F. App'x 661 (2d Cir. 2020); *United States v. Ng Lap Seng*, No. 15-CR-706, 2018 WL

---

[16] To the extent that Knowles argues that Manners' testimony about Knowles'
involvement in the Cruz murder was false, this argument, in fact, cuts the other way; if Manners'
credibility is in question, then his recantation must be viewed with suspicion as well.  *Cf. Yates v.*
*Rivera*, No. 03-CV-1057, 2007 WL 2027284, at *11 (N.D.N.Y. July 9, 2007) ("Because [the
witness's] story was at odds with her own prior sworn statements and her testimony in [other
proceedings] as well as with [the] petitioner's prior statements and his trial testimony, had [the
witness] testified at trial as she did at the hearing on the motion, she likely would have hindered,
rather than helped, [the] petitioner's case because her changed testimony would likely have been
disregarded as simply not credible.").

2287101, at *19 (S.D.N.Y. May 9, 2018) (denying motion for a new trial where it was
"undisputed that the alleged perjury concerned a matter entirely collateral to issues related to the
crimes of which [the defendant] was convicted").

    If, instead, Manners intended to recant the portion of his testimony relating to Petitioner's
narcotics distribution, there is, as the Government states, "ample evidence" of Petitioner's efforts
to traffic in drugs.  (Gov't Opp'n at 17.)  Thus, Manners' recantation is not material, because
there was ample independent evidence to support the conviction.  Petitioner's own papers
support this argument.  For example, according to Petitioner, at trial, "Granger claimed to have
seen Knowles selling crack cocaine many times between 2001 and 2009," (Pet'r's Habeas Mem.
at 7; *see also* Tr. at 69), and Harris "claimed to have seen Knowles selling crack on Elm Street
more than twenty times," (Pet'r's Habeas Mem at 17; *see also* Tr. at 786).  *See Sanders*, 863
F.2d at 225 ("Only recantations of material testimony that would most likely affect the verdict
rise to the level of a due process violation . . . ."); *cf. Stewart*, 433 F.3d at 300 ("Where, as here,
'independent evidence supports a defendant's conviction, the subsequent discovery that a
witness's testimony at trial was [allegedly] perjured will not warrant a new trial.'" (quoting
*United States v. Wong*, 78 F.3d 73, 82 (2d Cir. 1996))).

    "Even if [the Court] were to accept [Petitioner's] assertion that [Manners'] recantation is
the truth, that would not lead to the conclusion that the prosecutor knowingly elicited
perjury. . . .  The prosecutor, like the jury, could have reasonably concluded that [Manners']
testimony that [Petitioner] was the shooter was true, and that [Manners] recanted due to fear of
[Petitioner]." *Hamilton v. Herbert*, No. 01-CV-1703, 2004 WL 86413, at *17 (E.D.N.Y. Jan. 16,
2004).  And, "the Court cannot conclude that had [Manners' alleged] untruthfulness . . . been
fully explored, his credibility regarding [Petitioner's] involvement [in the Cokley murder] would

have been so diminished that [Petitioner] would not have been convicted." *United States v. Borkoski*, 154 F. Supp. 2d 262, 271–72 (D. Conn. 2001); *cf. United States v. Spataro*, No. 04-CR-911, 2009 WL 10718512, at *6 (E.D.N.Y. Aug. 24, 2009) ("[T]he jury had ample independent evidence that corroborated [the allegedly perjurious witness's] testimony that [the defendant] was . . . involved in the conspiracy to murder [the victim].").

Similarly, there is no reasonable likelihood that Glover's allegedly false signed statement to the Government "could have affected the judgment of the jury." *Wallach*, 935 F.2d at 456. This is primarily because, as discussed previously, Glover did not even testify at the trial. Thus, whether she signed an allegedly false statement was irrelevant to the jury. Petitioner argues that because the Government allegedly coerced Glover into signing the statement, "the defense did not interview Ms. Glover, as there is no point to interviewing a contrary witness." (Pet'r's Am. Reply at 15.) The Court rejects Petitioner's logic on this point. That Glover signed a statement did not prevent Petitioner's counsel from speaking with Glover in advance of any testimony she might have given. Further, "[t]he only 'proof' [Petitioner] presents that [Glover] was coerced . . . is an unsworn, undated [transcript] submitted by [the] defense investigator . . . . [The transcript] lacks credibility and does not . . . come close to substantiating [Petitioner's] claim that [Glover] was subjected to pressure or coercion by the prosecutor or police." *Dixon v. Conway*, 613 F. Supp. 2d 330, 340 (W.D.N.Y. 2009).

In sum, the Court finds that Petitioner's claims of prosecutorial misconduct based on the allegation that the Government coerced Manners' testimony and coerced Glover into signing a false statement are procedurally barred. And, in any event, these claims fail on the merits and are thereby dismissed.

4. Other Arguments

Petitioner argues in a Supplemental Memorandum, which he filed without leave of this Court, that his convictions for violating two provisions of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. §§ 924(c) and 924(j), should be vacated in light of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), which held that 18 U.S.C. 924(c)(3)(B) was unconstitutionally vague, *id.* at 2336.  (*See generally* Pet'r's Supp. Mem. in Supp. of Pet. for Writ of Habeas Corpus ("Pet'r's Supp'l Habeas Mem.") (Dkt. No. 5-1, Case No. 18-CV-1950).).  Petitioner argues that "[j]ust as § 924(c)(3)(B) was a vague 'residual clause,' §924(c)(1)(iii) is a vague sentencing clause that suffers from the same infirmities . . . ." (Pet'r's Supp'l Habeas Mem. at 5.)[17]

The Government correctly argues, however, that Petitioner's claim is procedurally defaulted.  Specifically, the Government, argues that Petitioner:

> [P]rocedurally defaulted any argument that the counts he now challenges are vague, because he failed to make that argument before this Court in 2013; before the Court of Appeals in 2015; and then before this Court in his . . . § 2255 motion in 2018,

---

[17] Petitioner is correct that the new rule announced *Davis* is substantive and thus has retroactive effect on collateral review—though the Court notes that the Supreme Court has held that new constitutional rules of criminal procedure do not apply retroactively, *see Teague v. Lane*, 489 U.S. 288, 310 (1989), but "[n]ew substantive [criminal] rules generally [do] apply retroactively," *Schriro v. Summerlin*, 542 U.S. 348, 313 (2004) (emphasis omitted).  "A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes."  *Id.* at 353.  In *Welch v. United States*, 578 U.S. 120 (2016), the Supreme Court held that *Johnson v. United States*, 576 U.S. 591 (2015), which struck down the residual clause in 18 U.S.C. § 924(e)(2)(B)(ii) as void for vagueness, announced a new substantive rule and thus "has retroactive effect . . . in cases on collateral review," *Welch*, 578 U.S. at 130.  The Supreme Court, in the wake of *Johnson*, applied the same logic in *Davis*, holding the residual clause in § 924(c)(3)(B) void for vagueness.  *See Davis*, 139 S. Ct. at 2336.  It follows, then, that *Davis* also announced a new substantive criminal rule that has retroactive effect on collateral review.

even though the vagueness issue was available to Knowles, and if fact, was being actively litigated in both the Supreme Court and the lower courts.

(Gov't's Mem. in Opp'n to Pet'r's Supp'l Mem. in Supp. of Pet. for Writ of Habeas Corpus ("Gov't's Supp'l Opp'n") at 1 (Dkt. No. 8, Case No. 18-CV-1950).)  The Court agrees.

As discussed above, "a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal." *United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011).  The procedural default rule applies even where a new substantive rule of federal criminal law is announced after the defendant's conviction.  *See Bousley*, 523 U.S. at 621 (finding that the petitioner's claim was procedurally defaulted despite retroactive application of new substantive criminal rule); *Thorn*, 659 F.3d at 230–34 (same); *Fordham v. United States*, 706 F.3d 1345, 1349–51 (11th Cir. 2013) (same); *Jennings v. United States*, 696 F. 3d 759, 764 (8th Cir. 2012); *see also Harrington v. United States*, 689 F.3d 124, 129, 138 (2d Cir. 2012) (noting application of procedural default rule to the petitioner's claim that new substantive criminal rule applied retroactively on collateral review).

As previously noted, there is an exception to the procedural default rule if the defendant establishes (1) cause and prejudice or (2) actual innocence.  *Thorn*, 659 F.3d at 231.  The Court notes that Petitioner again does not address procedural default and thus cannot meet his burden. *Leecan*, 822 F. Supp. at 56 ("[T]he petitioner bears the burden of showing cause for his failure to raise [a] claim . . . and prejudice arising therefrom.")  In any event, Petitioner cannot show cause or actual innocence.  The most applicable ground to show cause would be that Petitioner's claim is "so novel that its legal basis [was] not reasonably available to counsel." *Murray*, 477 U.S. at 489–90 (citation omitted); *see also McCleskey v. Zant*, 499 U.S. 467, 494 (1991); *Whitman v. United States*, 754 F. App'x 40, 42 (2d Cir. 2018) (summary order) (quoting *Reed v. Ross*, 468 U.S. 1, 16 (1984)).  However, "[t]he futility test to excuse a default is strict: 'the question is not

whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was available at all.'" *Thorn*, 659 F.3d at 233 (quoting *Smith v. Murray*, 477 U.S. 527, 537 (1986)); *see also Engle v. Isaac*, 456 U.S. 107, 134 (1982) (holding that purportedly novel claim is not cause for procedural default where "other defense counsel have perceived and litigated that claim"). By the time of Petitioner's appeal, the question of whether similar residual clauses were unconstitutionally void for vagueness was actively being litigated by defense attorneys. The best example is *Johnson*, which the Supreme Court decided two weeks prior to Petitioner's sentencing, (*see* Gov't's Supp'l Opp'n at 17 n.12), and which the Supreme Court directly relied upon in holding that § 924(c)(3)(B) was void for vagueness in *Davis*, *see generally* 139 S. Ct. 2319. Other courts had also already considered the constitutionality of similar provisions of the ACCA. *See, e.g.*, *United States v. Verner*, 300 F. App'x 435 (8th Cir. 2008) (summary order) (considering challenge to § 924(e)(2)(B)(ii) as void for vagueness); *United States v. LaCasse*, 253 F. App'x 553 (6th Cir. 2007) (summary order) (same); *United States v. Santos*, No. 91-CR-724, 1992 WL 232057 (S.D.N.Y. Sept. 2, 1992) (same for § 924(c)(1)). The Government also points out that as far back as 2007, Justice Scalia mentioned in a dissent that the ACCA's residual provision could be "impermissibly vague." *James v. United States*, 550 U.S. 192, 216 (2007) (Scalia, J., dissenting). Thus, this argument was not even novel by the time that the Supreme Court decided *Davis*.

To the Petitioner attempts to argue that the Second Circuit's decision in *United States v. Barrett*, 903 F.3d 166 (2d Cir. 2018), which rejected the argument that § 924(c)(3)(B) was unconstitutionally vague, *id.* at 169—and which was eventually abrogated by *Davis*—proves that Petitioner would have been unsuccessful if he had attempted to raise a similar argument on appeal, that is of no matter. "A defendant cannot establish cause for a procedural default by

42

showing 'simply that a claim was unacceptable to that particular court at that particular time.'" *Thorn*, 659 F.3d at 233 (quoting *Bousley*, 523 U.S. at 623). Petitioner therefore cannot show cause for failing to raise this purportedly novel issue. And, "[b]ecause [P]etitioner has failed to show cause for his procedural default, it is unnecessary to determine whether his counsel's performance prejudiced [P]etitioner." *Leecan*, 822 F. Supp. at 57.

Any argument Petitioner attempts to make for actual innocence similarly fails. As discussed above, "[i]n order to demonstrate his actual innocence, [a petitioner] must prove his 'factual innocence, not mere legal insufficiency,' and 'demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.'" *Corley*, 2020 WL 4676650, at *11 (quoting *Bousley*, 523 U.S. at 623). The Government argues that "[t]he evidence that Knowles murdered Cokley was overwhelming, and convinced a jury of his peers (a decision subsequently affirmed by the Second Circuit)." (Gov't's Supp'l Opp'n at 17). The Court agrees. Petitioner has not brought forth any evidence whatsoever to support a finding of factual innocence with respect to his convictions under the ACCA. And as the Court has previously noted, "the evidence of [Petitioner's] guilt at trial was overwhelming, and th[e] [actual innocence] exception therefore cannot salvage these arguments." *Corley*, 2020 WL 4676650, at *11.

Given that Petitioner cannot establish cause and prejudice or actual innocence, Petitioner's claim is procedurally defaulted, and the Court will therefore not reach the merits of this claim.

\*     \*     \*

In sum, the Court rejects Petitioner's claims for habeas relief based on ineffective assistance of counsel (both at the trial and appellate levels), prosecutorial misconduct, and

statutory vagueness. Thus, finding no grounds to grant Petitioner's requested habeas relief under § 2255, the Petition is denied.[18]

### B. Rule 33 Motion for New Trial

#### 1. Applicable Law

Rule 33 allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). The Second Circuit has explained that a new trial is appropriate under Rule 33 only where it would be a "manifest injustice to let the guilty verdict stand." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992) (quotation marks omitted). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *United States v. Viera*, No. 14-CR-83, 2021 WL 1320891, at *5 (S.D.N.Y. Apr. 8, 2021) (quoting *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009)). Thus, to uphold the conviction, "[t]he district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation," of whether "competent, satisfactory[,] and sufficient evidence in the record supports the jury verdict." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir.2001) (quotation marks omitted). A district court should "exercise [its] Rule 33 authority sparingly and in the most extraordinary circumstances." *Id.* (quotation marks omitted); *see also United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995) (noting that Rule 33 "motions for a new trial are disfavored" in the Second Circuit), *cert. denied*, 517 U.S. 1187 (1996); *Viera*, 2021 WL 1320891, at *4 (same).

---

[18] Because the Petition did not "set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [Petitioner] to relief," Petitioner is not entitled to a hearing. *Gonzalez*, 722 F.3d at 131.

### 2.  Application

#### a.  Timeliness

A Rule 33 motion must be filed within 14 days of the verdict, unless it is "grounded on newly discovered evidence," in which case it must be filed within three years.  FED. R. CRIM. P. 33(b).  The Court may extend this filing deadline "if the party failed to act because of excusable neglect."  FED. R. CRIM. P. 45(b)(1)(B); *see Eberhart v. United States,* 546 U.S. 12, 19 (2005) (holding that Rule 33 must be read in conjunction with Rule 45(b)); *see also United States v. Jiau*, 644 F. App'x 92, 93 (2d Cir. 2016) (summary order) (noting that a court may "consider [an] untimely [Rule 33] motion if the court determines that the failure to file it was the result of excusable neglect." (quoting FED. R. CRIM. P. 33(b) Advisory Committee's Note to 2005 Amendment)).

The jury returned its verdict against Petitioner on July 1, 2013.  (*See* Dkt. (minute entry for July 1, 2013), Case No. 11-CR-630; *see also* Judg. 1–2.)  Petitioner filed the instant Motion on March 3, 2018, (Dkt. No. 1300, Case No. 11-CR-630), on the grounds of newly discovered evidence, (*see id.*).  Because the Motion was filed almost five years after the verdict, for the Motion to be timely, Petitioner must show excusable neglect.

"Excusable neglect is not easily demonstrated, nor was it intended to be."  *United States v. Williams*, No. 10-CR-622, 2017 WL 5483744, at *3 (E.D.N.Y. Nov. 15, 2017) (citation omitted).  Courts consider four factors in connection with an assertion of excusable neglect: (1) "the length of the delay and its potential impact upon judicial proceedings"; (2) "the danger of prejudice" to the non-movant opposing the extension; (3) "the reason for the delay, including whether it was in the reasonable control of the movant"; and (4) "whether the movant acted in good faith." *United States v. Hooper*, 9 F.3d 257, 259 (2d Cir. 1993) (quotation marks

omitted) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (2017)); *see also Pioneer*, 507 U.S. at 395 ("[T]he determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission.").

Regarding the first factor, "[t]he length of th[e] delay is significant." *United States v. Kidd*, No. 18-CR-872, 2021 WL 2935971, at *2 (S.D.N.Y. July 13, 2021). As mentioned previously, Petitioner filed the instant Motion nearly five years after the time to file it had expired. Courts in this district have found significantly shorter delays to be too long to support a finding of excusable neglect. *See id.* at *2 (concluding that Rule 33 motion filed two years after the verdict was untimely); *see also Jiau,* 644 F. App'x at 93 (affirming the district court's conclusion that the Rule 33 motion filed "eleven months after the verdict" was untimely); *United States v. DiPietro*, 278 F. App'x 60, 61 (2d Cir. 2008) (summary order) (concluding that the district court did not abuse its discretion by finding that a Rule 33 motion "filed nearly ten months after judgment was entered" was untimely); *United States v. Urena*, No. 05-CR-0760, 2008 WL 2229847, at *2 (S.D.N.Y. May 29, 2008) (concluding that excusable neglect had not been established and finding that the delay of eight months was "substantial").

Similarly, a delay of five years would result in "considerable risk of prejudice to the Government were it required to retry this case . . . ." *Kidd*, 2021 WL 2935971, at *3. "As time goes by, the likelihood of trial witnesses[] becoming unavailable increases." *United States v. Sabir*, 628 F. Supp. 2d 414, 417 (S.D.N.Y. 2007), *aff'd in part sub nom. United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011). This is particularly true here, where Petitioner's trial took place in the summer of 2013—over eight years ago. *See United States v. Williams*, No. 10-CR-622, 2017 WL 5483744, at *3 (E.D.N.Y. Nov. 15, 2017) (finding that the "government would likely experience some level of prejudice if th[e] [c]ourt were to grant a motion for a new trial"

where six years had passed since the defendant's trial, because "[w]ith the passage of time carries a heightened risk of faded memories"); *United States v. Cook*, No. 13-CR-777, 2014 WL 12681367, at *1 (S.D.N.Y. Nov. 17, 2014) ("The reliability of witness testimony naturally degrades over time and thus questioning the reliability of [the witness's] testimony six months later than necessary may cause prejudice to the [g]overnment."), *aff'd sub nom. United States v. Gill*, 674 F. App'x 56 (2d Cir. 2017). "At a new trial or hearing, [Petitioner] would have the advantage of cross-examining government witnesses on events that occurred [over eleven] years ago involving [eight]-year-old testimony." *Williams*, 2017 WL 5483744, at *3. The "risk" of prejudice to the Government is "even greater" here, "considering . . . the sensitive nature of the[] testimony [of the trial witnesses]." *Kidd*, 2021 WL 2935971, at *3.

Nor does Petitioner provide a justifiable reason for the delay. Petitioner attempts to justify the delay by arguing that "counsel herein was not hired until after the time limitation for a Rule 33 motion had expired." (*Id.*) However, "missed filing deadlines cannot be erased any time a defendant chooses to have new counsel. Were such a rule to exist, defendants would constantly seek new attorneys, even if replacing competent ones, simply to have an end-run around Rule 33(b)(2)'s 14-day deadline." *United States v. Ketabchi*, No. 17-CR-243, 2019 WL 1510444, at *3 (S.D.N.Y. Mar. 25, 2019), *appeal dismissed sub nom. United States v. Sinclair*, No. 19-1079, 2020 WL 6146339 (2d Cir. June 8, 2020). Next, Petitioner argues that his new counsel was "relying upon an earlier version of Rule 33," and that "had [she] been aware that the time for a Rule 33 had expired, she would have argued that the defendant's trial attorney was ineffective for failing to pursue a Rule 33 motion after Mr. Wilson had been sentenced." (Pet'r's Am. Reply at 2 n.1.) However, "[i]n the absence of exceptional circumstances, each party is responsible for knowing the pertinent procedural rules and principles and for taking such steps as

are needed to protect its own interests." *Endicott Johnson Corp. v. Liberty Mut. Ins. Co.*, 116 F.3d 53, 57 (2d Cir. 1997).  Moreover, Petitioner "has failed to even allege, much less assert supportive facts to show, that his trial counsel—who mounted an aggressive and nuanced defense at trial in the face of substantial inculpatory evidence—was ineffective in not filing a Rule 33 motion." *Ketabchi*, 2019 WL 1510444, at *3.

The Court has no reason to believe Petitioner's request to seek an extension of his Motion was made in bad faith.  But, because the remaining factors weigh in favor of the Government, the Court finds that Petitioner has failed to meet his burden to show excusable neglect, and thus the Motion is untimely.  *See Kidd*, 2021 WL 2935971, at *3 (denying Rule 33 motion as untimely even where the court "ma[de] no finding as to defense counsel's good or bad faith in seeking an extension to file the" motion, because "the remaining factors weigh in the Government's favor" and thus finding that the defendant "failed to establish excusable neglect" (quotation marks omitted)); *Ketabchi*, 2019 WL 1510444, at *3 ("Although the [c]ourt has no reason to characterize the sincerity of [the defendant's] extension request as one taken in . . . bad faith . . . the balance of the relevant considerations lead the [c]ourt to find [the] defendant's delay to not constitute excusable neglect.").

This result is not changed by the fact that the arguments in Petitioner's Rule 33 Motion were incorporated by reference in Petitioner's Habeas Petition.  Specifically, Petitioner argues that because his Habeas Petition was timely filed, and because the arguments of his Rule 33 Motion were "incorporated by reference" therein, the Court should "grant a new trial under 28 U.S.C. § 2255 for newly discovered evidence" because "the standards for vacating a conviction for newly discovered evidence pursuant to Rule 33 and 28 U.S.C. § 2255 are virtually the same." (Pet'r's Am. Reply at 2.)  However, Petitioner's argument is inapposite given that, as discussed

48

above, the Court denied the Petition on all grounds.  And, as discussed infra, the Court similarly

dismisses the Motion on the merits.

### b.  Newly Discovered Evidence

The Government argues that even if Petitioner's Motion was timely, it must fail.

(Gov't's Opp'n at 12–15.)  The Court agrees.  "[N]ewly discovered evidence must be of a sort

that could, if believed, change the verdict."  *Gambino*, 59 F.3d at 364.  "The Second Circuit's

standard for Rule 33 motions based on newly discovered evidence requires that: '(1) the

evidence be newly discovered after trial; (2) facts are alleged from which the court can infer due

diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the

evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an

acquittal.'"  *United States v. Choudhry*, 330 F. Supp. 3d 815, 834 (E.D.N.Y. 2018) (quoting

*United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007)), *aff'd*, 813 F. App'x 4 (2d Cir. 2020);

*United States v. Forbes*, 790 F.3d 403, 406–07 (2d Cir. 2015) (same).  "To justify the

extraordinary relief authorized by Rule 33, the evidence must not simply be 'newly discovered'

by defendant; rather, the defendant must demonstrate that such evidence was effectively

undiscoverable at the time of trial."  *United States v. Carpenter*, 520 F. Supp. 3d 290, 293

(E.D.N.Y. 2021) (citing *United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir. 1992)).

In support of his Motion, Petitioner submitted four sworn affidavits, which, together,

allege an alibi for Petitioner on the night of Cokley's murder.  (*See* Pet'r's Mem. in Supp. of. R.

33. Mot. for New Trial (Pet'r's R. 33 Mem.") at 20–25 (Dkt. No. 1301, Case No. 11-CR-630).)

In the first affidavit, Petitioner's co-defendant Wilson[19] stated that on the night of July 4, 2009,

---

[19] As discussed above, Wilson pled guilty to conspiracy to commit murder in aid of a
racketeering enterprise for disposing of the murder weapon (*see* Wilson Judg. at 1; *see also*

"I was drinking with several . . . people, including Dexter Granger, Michael Dennis, and Steven Knowles. We got into a car and began driving around. We stopped by Steven Knowles' apartment for a while. Manny stayed home and the rest of us went out again."[20]   (Pet'r's R. 33 Mem. Ex. A ("Wilson Affidavit") ¶¶ 5–6 (Dkt. No. 1301-1, Case No. 11-CR-630).)  Wilson also stated that, after reviewing the video from the Cokley shooting while awaiting trial in the Westchester County Jail, he determined that the murder weapon "did not look like the gun that was recovered from me at the time of my arrest. The gun in my possession at the time of my arrest was chrome. The gun in the video was not." (*Id.* ¶¶ 16–17.)[21]

In the second affidavit, Alexandria Jamison ("Jamison"), who was living at the Knowles family's apartment at the time of the Cokley murder, stated:

> In February or March of 2009 . . . I had met the Knowles family and they took me in at their apartment at 245 Warburton Avenue, in Yonkers. In June of 2009 I began the process of moving to Virginia. I drove back and forth a few times to collect and transport my belongings. I came back for the last time on approximately June 30 or July 1, 2009, and strayed [sic] through the weekend. I was staying in my room at the Knowles' apartment on July 4, 2009 at about 1:00 or 1:30 a.m., when Manny came home. He was very drunk. I was the only one who was awake. I brought Manny into my bedroom and he spend [sic] the night with me. No one else knew he had spent the night in my room, as it is in a separate part of the apartment from the other bedrooms. . . . About a week later, I left Yonkers for good.

(Pet'r's R. 33 Mem. Ex. B ("Jamison Affidavit") ¶¶ 5–12 (Dkt. No. 1301-2, Case No. 11-CR-630).)  In the third affidavit, Petitioner basically repeats the same story, stating:

> After my friends dropped me off at my apartment in the early hours of July 4, 2009, I went with Ms. Jamison to the room in which she was staying, which was at the far end of the apartment, and we spent the night together. No one else in my family

---

Pet'r's R. 33 Mem. at 25) and "was in the car when it drove to [the Housing Project]" on the night of the murder, (Pet'r's R. 33 Mem. at 25).

[20] As discussed above, Knowles was also known as "Manny Fresh." (Indict. ¶ 1.)

[21] The Court notes that, despite Wilson's statements to the contrary, Granger testified at trial that he believed the .357 revolver was the weapon used to murder Cokley because of its chrome color. (Tr. at 246–47.)

was aware that we had spent the night together, and I did not tell anyone as my girlfriend was pregnant with my child and I had not wanted her to know I'd spend a night with another woman.

(Pet'r's R. 33 Mem. Ex. C ("Knowles Affidavit") ¶¶ 16–17 (Dkt. No. 1301-3 Case No. 11-CR-630).)  Finally, in the fourth affidavit, Anna Armistead ("Armistead"), Petitioner's mother, confirmed that Jamison was staying in the Knowles' family apartment at the time of the Cokley murder before "moving down south," and was present on the night of July 4, 2009.  (Pet'r's R. 33 Mem. Ex. D ("Armistead Affidavit") ¶¶ 5–7 (Dkt. No. 1301-3 Case No. 11-CR-630).)

The Second Circuit has held that "when a defendant is aware that his codefendant could provide exculpatory testimony but is unable to obtain that testimony because the codefendant invokes his privilege against self-incrimination prior to and during trial, the codefendant's postconviction statement exculpating the defendant is not 'newly discovered evidence' within the meaning of Rule 33."  *Owen*, 500 F.3d at 88 (collecting cases); *see also United States v. Jacobs*, 475 F.2d 270, 286 n.33 (2d Cir. 1973) ("[A] court must exercise great caution in considering evidence to be 'newly discovered' when it existed all along and was unavailable only because a co-defendant, since convicted, had availed himself of his privilege not to testify."); *United States v. Raniere*, No. 18-CR-204, 2020 WL 6263570, at *2 (E.D.N.Y. Oct. 23, 2020) ("[W]hen a defendant's coconspirator refuses to testify on the basis of [his] Fifth Amendment privilege and then, following trial, indicates a willingness to testify, such testimony is not newly discovered regardless of how the impediment of the privilege was removed." (quotation marks omitted)); *United States v. Taylor*, No. 10-CR-268, 2016 WL 4734600, at *3 (E.D.N.Y. Sept. 9, 2016) (noting that the Second Circuit "generally has taken a dim view of attempts by co-defendants to offer exculpatory testimony regarding another defendant after trial"), *aff'd*, 802 F. App'x 604 (2d Cir. 2020).  In these circumstances, the Second Circuit has

characterized a co-defendant's postconviction exculpatory statements as "newly available" and not "newly discovered." *Forbes*, 790 F.3d at 407–09 (citing *Owen*, 500 F.3d at 91).

The Second Circuit has held that a new trial may not be granted under Rule 33 "on the basis of evidence that was known by the defendant prior to trial, but became newly available after trial." *Owen*, 500 F.3d at 89.  Applied to this case, the Court finds that Wilson, Jamison, and Armistead's putative testimony is not newly discovered, but instead only newly available, because the information was known to Petitioner before trial.  In Petitioner's own affidavit, he states that, on the night of Cokley's murder, he was with Wilson earlier in the night, (Knowles Affidavit ¶ 26), and that later in the night, he was with Jamison in the apartment he lived in with Armistead, (*id.* ¶¶ 15–16, 19).  Petitioner also states that when he learned that he was being charged for Cokley's murder, he "informed [his] attorney that [he] had an alibi for that night." (*Id.* ¶ 13.)

Where the identity of the new witness was known to the defendant at the time of trial, the Second Circuit and district courts within it have also declined to find due diligence.  *See United States v. Middlemiss*, 217 F.3d 112, 122–123 (2d Cir. 2000) (holding that the district court did not abuse its discretion in refusing to grant a new trial where "defense counsel knew about the witness and could have investigated [her] possible testimony"); *United States v. DiMattina*, 885 F. Supp. 2d 572, 578 (E.D.N.Y. 2012) ("There is no evidence that any of the affiants whose testimony is offered in support of the motion were unknown to the defendant at the time of trial."); *United States v. Roth*, No. 01-CR-401, 2003 WL 289615, at *4 (S.D.N.Y. Feb.10, 2003) (finding that the defendant did not exercise due diligence in obtaining the new evidence consisting of the testimony of two witnesses because such witnesses "were uniquely available to [the defendant] . . . before and during trial"), *aff'd sub nom. United States v. Greenfield*, 75 F.

App'x 813 (2d Cir. 2003); *accord United States v. Lisyansky*, No. 11-CR-986, 2014 WL 1046750, at *5 (S.D.N.Y. Mar. 13, 2014), *aff'd*, 806 F.3d 706 (2d Cir. 2015) (finding that the defendant did not exercise due diligence where "th[e] [new] witness would be called to testify to the sum and substance of what a known witness at the time of trial could have been called to testify about, and who the defense chose not to call.").

Further, Petitioner has failed to allege what steps—if any—were taken to locate Jamison apart from informing a private investigator hired by his attorney, who was, apparently, "unable to locate her." (Knowles' Affidavit ¶ 20.) Courts in this district have declined to find due diligence where the defendant's "defense attorney could have consulted with his client regarding his whereabouts on that day and if there were any potential alibi witnesses." *DiMattina*, 885 F. Supp. 2d at 579. Further, Petitioner's attorney could have "sought to subpoena [Jamison] or to have the [G]overment produce [her], or to have the case adjourned until [she] could be located." *Id.* at 578 (alterations in original) (quoting *United States v. Puco*, 338 F. Supp. 1252, 1255 (S.D.N.Y. 1972)). Indeed, "[Petitioner] was fully aware, while the trial was still ongoing, that an alibi defense was available. No motion for a continuance to obtain alibi witnesses was made." *Id.* at 579.[22]

---

[22] Petitioner also fails to allege diligent efforts taken on his or his mother's part to locate Jamison. Petitioner simply states that immediately after his arrest, he "asked [his] mother . . . and other family members if they knew how I could reach [Jamison]." (Knowles Affidavit ¶ 19.) Similarly, Petitioner's mother attested that, "[i]mmediately after my son was arrested in August of 2011, he asked me to find [Jamison], but he did not tell me why he needed her. . . . I reached out to people who I thought might know her, but no one [knew] how to find [Jamison]." (Armistead Affidavit ¶¶ 11–12.) It defies credulity that, facing a federal trial and a possible life sentence, Petitioner and his family would not have engaged in more fulsome efforts to locate Jamison.

The Court further notes that the fact that Jamison was unaware that her testimony was needed is irrelevant. "The fact that [a] 'new' witness[] state[s] that [she] did not know [her] information was of value to [Petitioner] until after his trial is immaterial, for it is not what the

Moreover, as the Government points out, Petitioner has failed to explain, why, after Jamison became aware in "late 2016" that Petitioner "had been charged with a murder," it took almost another year to obtain Jamison's affidavit, which was signed on October 28, 2017.  (Jamison Affidavit at 2.)  Nor does Petitioner explain why it took another four months after Jamison signed the affidavit for Petitioner to file the Motion on March 3, 2018.  (*See* Mot. for New Trial (Dkt. No. 1300, Case No. 11-CR-630).)  Petitioner has therefore failed to meet his burden to show due diligence.

Finally, the Government argues that the Jamison and Wilson affidavits are "immaterial, cumulative, and would not likely result in an acquittal, given the overwhelming evidence against Knowles." (Gov't Opp'n at 14–15.)  In support of this the Government points out that:

> Three cooperating witnesses testified about Knowles' involvement in Cokley's murder: Dexter Granger and Michael Dennis walked the jury through the events of the evening of the murder, based on their own participation in those events, and Jason Harris testified about, among other things, his contemporaneous understanding of what had happened from Shantel Williamson, his detailed actions to try to ensure Knowles was not caught, and Knowles' later detailed admission about killing Cokley.

(*Id.*)  The Court also notes, as discussed above, that the Government relied on additional evidence apart from the testimony of cooperating witnesses, including the testimony of eyewitnesses, crime scene photographs, ballistics evidence, and surveillance video.  *See supra*. Courts in this district have declined to grant a new trial on the grounds of newly discovered evidence where there was "overwhelming evidence implicating [the] [d]efendant in the . . . murder." *Taylor*, 2016 WL 4734600 at *4; *see also United States v. Rosario*, No. 14-CR-

---

witness knows, but what [Petitioner] knows about the witnesses which determines whether material evidence could have been discovered with due diligence before or during trial. *United States v. Puco*, 338 F. Supp. 1252, 1255 (S.D.N.Y. 1972), *aff'd,* 461 F.2d 846 (2d Cir. 1972), and *aff'd,* 493 F.2d 1399 (2d Cir. 1974).

603, 2017 WL 3841867, at *4 (S.D.N.Y. Sept. 1, 2017) (motion for new trial denied where there

was "ample evidence of [the defendant's] guilt," including witness testimony, physical evidence,

and surveillance records); *United States v. DeSimone*, 947 F. Supp. 2d 216, 220 (N.D.N.Y. 2013)

(allegedly newly discovered evidence not material where "[a] plethora of evidence was presented

by the government at trial").  Additionally, "given the contradictions between [Jamison and

Wilson's new testimony] and the evidence introduced at trial, the Court finds that the jury's

verdict would not have been different had [those] [witnesses] been present[] at trial." *United*

*States v. Tejeda*, 249 F.R.D. 467, 469 (S.D.N.Y. 2008).  Accordingly, Petitioner has failed to

meet his burden to show that this allegedly newly discovered evidence would have "change[d]

the verdict" at trial, *Gambino*, 59 F.3d at 364, and thus his Motion for a new trial is denied.[23]

---

[23] Petitioner argues in the alternative that he should be granted habeas relief on the same
ground as his Rule 33 motion—that of newly discovered evidence.  (*See* Pet'r's Habeas Mem. at
49 –50.)  However, for the same reasons that the Court denies Petitioner's Motion, the Court
denies Petitioner habeas relief on the ground of newly discovered evidence.  Moreover, the
Supreme Court has held that "[c]laims of actual innocence based on newly discovered evidence
have never been held to state a ground for federal habeas relief absent an independent
constitutional violation occurring in the underlying . . . criminal proceeding." *Herrera v. Collins*,
506 U.S. 390, 400 (1993); *see also Perez*, 2020 WL 11627180, at *12 (same).  Given that the
Court has found no independent constitutional violation in connection with these would-be alibi
witnesses (and Petitioner has alleged no such independent constitutional violations), Petitioner is
not entitled to habeas relief based on newly discovered evidence.

III.  Conclusion

For the foregoing reasons, Petitioner's Petition and Motion are denied.  The Clerk of

Court is respectfully directed to terminate the instant Petition, (Dkt. No. 1, Case No. 18-CV-

1950), and Motion, (Dkt. No. 1300, Case No. 11-CR-630), and close Case No. 18-CV-1950.

SO ORDERED.

DATED:      March 30, 2022
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE